David L. Kurtz – 007433
dkurtz@kurtzlaw.com
THE KURTZ LAW FIRM
7420 East Pinnacle Peak Road, Suite 128
Scottsdale, Arizona 85255
Telephone: (480) 585-1900

Attorneys for Plaintiffs

### UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| Leroy and Donna Haeger, husband and wife; Barry and Suzanne Haeger, husband and wife; Farmers Insurance Company of Arizona, an Arizona corporation,<br><br>plaintiffs,<br><br>vs.<br><br>Goodyear Tire and Rubber Company, an Ohio corporation; Spartan Motors, Inc., a Michigan corporation; and Gulfstream Coach, Inc., an Indiana corporation,<br><br>Defendants. | No. 2:05-cv-02046- GMS<br><br>**PLAINTIFFS' SUPPLEMENTAL STATEMENT OF FACTS IN SUPPORT OF MOTION TO EXPAND THE RECORD AND FOR EXPANDED AWARD OF ATTORNEYS FEES, COSTS AND OTHER RELIEF FOR GOODYEAR'S FRAUD UPON THE COURT** |

### BACKGROUND AND HISTORICAL CONTEXT:

The following factual record sets forth what has remained concealed from the District Court in support of the Haegers' Request for Expanded Fee Award.

The factual references relate to disclosures, depositions, transcripts and court filings in multiple cases. The District Court case is described as "*Haeger* I." It was filed in 2005 and settled in 2010. In 2011, *Haeger* I was reopened for discovery fraud. It focused upon concealed test data and related deceptions. The sanction proceedings spanned more than a year. Goodyear's varied acts of then known deceptions were set forth in a published opinion issued November 2012. A judgment

1    for fees and costs was entered on August 26, 2013.  (Doc. 1126)  The Court's factual
2    findings were based upon clear and convincing evidence.   None of those findings
3    have ever been reversed.  Many are referenced hereafter.

4          In May 2013, *Haeger* II was commenced in Maricopa County Superior Court.
5    It sought damages from Goodyear and its attorneys for fraud and abuse of process.  It
6    was settled on January 25, 2017.

7          Goodyear appealed *Haeger* I.  A divided panel of the Ninth Circuit affirmed
8    the District Court's Judgment.  813 F.3d 1233 (9th Cir. 2015).  Goodyear appealed
9    the Ninth Circuit decision.  The United States Supreme Court reversed and remanded
10   this case for these further proceedings.  (*Goodyear v. Haeger*, 137 S. Ct. 1178
11   (2017).)

12         On July 5, 2017, Judge Silver entered an order recusing herself.   Judge
13   Silver's recusal requires the presentation of a more extensive record to integrate the
14   Court.

15         The following facts reveal how Goodyear concealed relevant facts regarding
16   property damage, injury and death in discovery responses in bad faith, deceived the
17   Court during the very first discovery dispute hearing, knowingly evaded compliance
18   with a January 2007 court order compelling the production of warranty and property
19   damage claims information (requested in September 2006), continually deceived the
20   Court regarding its prior orders, lied about compliance with its production
21   requirements, and willfully misled the Court regarding claims related to the tire at
22   issue (the G159).  Additional facts are set forth to establish a pattern and practice of
23   deception in G159 cases, before, during and after *Haeger* I as part of a scheme to
24   defeat G159 claims.  These facts further set forth how Goodyear concealed crucial
25   liability data regarding a 2006 National Highway Traffic Administration (NHTSA)

26

1   investigation, deceived the Court as to the nature of the investigation and what

2   Goodyear was compelled to disclose regarding the G159.[1]

3        The facts also address new findings issued by Judge Hannah on April 4, 2018

4   and April 3, 2018, NHTSA developments regarding its defect investigation regarding

5   the G159 (which commenced on January 1, 2018).

6        After Goodyear was ultimately compelled to:  (1) disclose all G159 failure

7   data, and (2) finally produce what it disclosed to NHTSA in 2006 (prior to any

8   discovery in *Haeger* I), *Haeger* II was quickly settled by Goodyear within three (3)

9   weeks on January 24, 2017.

10        These previously unknown facts set forth the predicate for both "but for"

11   causation for more than a decade of wasted judicial resources, attorney's fees and

12   costs and reveal a Goodyear plan in place to deceive the government, victims,

13   litigants and courts across the nation about the truth regarding the Goodyear G159

14   tire.  The following facts set forth that history.[2]

15   **HISTORICAL PROCEDURAL FACTS**:

16        1.    The tire at issue is a Goodyear G159 275/70R22.5 radial medium truck

17   tire.  ("G159").

18        2.    On June 14, 2003, the Haegers' Class A Gulfstream motorhome was

19   involved in a rollover accident caused by the failure of the right front G159 on the

20   motorhome.

21        3.    On June 10, 2005, the Haegers filed their Complaint in the Maricopa

22

---

[1] The preceding paragraph is acknowledged advocacy.  I tis included so that the Court will understand the purpose of the factual references.

[2] Counsel has endeavored to limit factual disclosures to those necessary to support an expanded award of attorney fees and other relief, as the Court may deem appropriate.  As the Court is unfamiliar with the vast record, spanning thousands of separate filings in G159 cases, the pertinent facts are necessarily detailed to assure an adequate record is provided to support the Court's determinations.

County Superior Court alleging product liability design defect, product liability failure to warn, product liability post-sale warning, negligent design, negligent failure to warn and negligent post-sale failure to warn.

4.     On July 11, 2005, the case was removed to the United District Court for the District of Arizona and assigned to Judge Roslyn Silver.

5.     *Though not disclosed* during *Haeger* I, in *Haeger* II Goodyear was compelled to reveal that there were 41 lawsuits filed alleging defects with the G159. (**Exhibit 1**, List of lawsuits.)  *Haeger* I was the 22nd lawsuit filed.  Forty (40) of the suits were filed before *Haeger* I was settled in April 2010.

6.     By 2003, Goodyear had coordinated the defense of G159 cases at a national level by the retention of National Coordinating Counsel, Roetzel & Andress. Goodyear Associate General Counsel Deborah Okey was the "decision-maker" regarding what would and would not be disclosed in discovery in the various G159 cases.  (*Haeger v. Goodyear*, 906 F. Supp.2d 938, 941, 943.)

7.     Prior to the Haegers submitting their first set of requests for production to Goodyear in *Haeger* I, the Office of Defect Investigation (ODI) of the National Highway Traffic Safety Administration (NHTSA) was conducting an investigation regarding front tire failures that occurred from 1995 to 2000 pm Country Coach Allure and Intrigue, Class "A" motorhome recreational vehicles.[3]  NHTSA issued "peer inquires" to Goodyear, Michelin and General Tire to: (1) determine the appropriate "failure rates" due to tire blowout, tread separation, abrupt loss of air, and the like for front tires manufactured, sold and installed in Class "A" motorhomes; (2) determine approximate comparative "failure rates" due to tire blowout, tread separation, abrupt loss of air, and the like, for "equivalent" size tires

---

[3] Motorhomes are sold as Class A, Class B and Class C.  Class A motorhomes are the largest motorhomes sold in the market.

1  manufactured and sold and installed in "other" (non-motorhome) vehicle
2  applications.  (3) to determine the precise number of tires that Goodyear sold as
3  original equipment to manufacturers of Class A motorhomes since January 1, 2000.
4  (**Exhibit 2**, April 26, 2006 letter.)

5       8.    NHTSA admonished Goodyear that the failure to respond properly and
6  fully could subject Goodyear to civil penalties in accord with 49 U.S.C. §30165,
7  which as of that date had a maximum $15 million penalty for failing or refusing to
8  respond to NHTSA's requests.

9       9.    The April 26, 2006 correspondence was directed to the attention of Sim
10  Ford, Goodyear's Manager of Global Regulations, Standards and Compliance.

11       10.    Participants in responding to the peer request included all Goodyear
12  employees, all attorneys, law firms and other persons engaged directly or indirectly
13  by or under the control of Goodyear.  (*Id.* at p. 2.)

14       11.    NHTSA required disclosure of "failure reports" for Goodyear tires
15  manufactured since January 2000 which were mounted to 22.5" diameter rims and
16  were (a) sold as either original or replacement equipment to Class A motorhome
17  manufacturers, or (b) sold as original or replacement equipment for applications
18  *other* than Class A motorhomes.  (*Id.* at p. 4.)

19       12.    The tires at issue were limited to the very few sizes of Goodyear tires
20  that fit Class A motorhomes, including the 275/70R22.5 (the G159 at issue).  (*Id.* at
21  p. 2.)

22       13.    The "failure reports" that NHTSA required be disclosed were from all
23  Goodyear sources, "including warranty claims (also known as adjustments), owner,
24  dealer or manufacturer complaints *and/or* reports of a front tire failure caused by an
25  abrupt loss of air, whether confirmed or alleged, including but not limited to (1) air
26  loss resulting in an inability of the tire to support the wheel load; (2) blowout; (3) tire

1 rupture; (4) rapid deflation; (5) tread separation; (6) sidewall cracking; and the like."

2 (*Id.* at p. 2.)

3     14.    The failure reports Goodyear was to produce included failures caused

4 by normal wear-out, misuse or abuse, road debris and similar causes. (*Id.* at p. 3.)

5     15.    NHTSA required Goodyear to disclose: (1) the number of tires

6 designed to be mounted to a 22.5" rim that Goodyear sold as original equipment

7 (OE) to manufacturers of Class A motorhomes since January 2000 with a summary

8 that indicated (a) the number of tires in each size range that Goodyear sold each year

9 since 2000; (b) the number of failure reports for tires installed in the front vehicle

10 position for each specified size; and (2) to provide equivalent information for tires

11 sold for applications "other than Class A motorhomes" that fit on the same 22.5" rim.

12 (*Id.* at p. 5.)

13     16.    During *Haeger* II, Goodyear was compelled to disclose billing records

14 from Goodyear's attorneys.[4]  Those records revealed participation of Goodyear's

15 counsel in "attending a meeting on NHTSA reporting and related issues" on May 1,

16 2006. (**Exhibit 3**.)  This meeting took place 30 days before Goodyear complied with

17 NHTSA's disclosure requirements.

18     17.    Prior to discovery commencing in earnest in *Haeger* I, *Bogaert v.*

19 *Goodyear* was underway in the Maricopa County Superior Court.  *Bogaert* involved

20 an accident with a Fleetwood Class A motorhome and suit was filed in 2005.

21 Goodyear was represented by the same National Coordinating Counsel and local

22 counsel (Basil Musnuff of Roetzel & Andress and Graeme Hancock of Fennemore

23 Craig. (*Haeger v. Goodyear*, 906 F. Supp.2d 938, 957 (2012).)

24

25

26 [4] Production was associated with Goodyear's waiver of the attorney-client privilege during *Haeger* I.

18.   "As with other Goodyear cases, the *Bogaert* matter involved extreme difficulty convincing Goodyear to produce documents." (*Haeger, id.*)

19.   Under A.R.C.P. 26.1, Goodyear had affirmative disclosure obligations in *Bogaert*. *Id.* at 958. (Identification of witnesses with relevant knowledge or information and description of the knowledge or information. Description and location of documents which "may be relevant" and ESI data.)

20.   On February 2, 2006, the Bogaerts filed their initial disclosure statement. (**Exhibit 4**.)

21.   It set forth the Bogaerts' defect theory that the G159 lacked adequate durability to resist tread separations. (**Exhibit 5**, Medina Deposition of December 12, 2016, p. 30.)

22.   On July 7, 2006, Goodyear responded to the Bogaerts' First Request for Production. Goodyear set forth 16 general objections. It also objected to each of the 16 requests for production, including the identification of Goodyear communications with NHTSA regarding the G159. (**Exhibit 6**, Response to Request for Production No. 11.) Goodyear represented, "it possesses no documents relating to communications with NHTSA re the Subject Tire (the G159) on the Subject Vehicle (a Fleetwood motorhome).

23.   Throughout the *Bogaert* litigation, the NHTSA communications with Goodyear regarding the G159 were concealed from the Bogaerts' counsel. Goodyear never disclosed what it revealed to NHTSA. (**Exhibit 7**, Medina Deposition of December 12, 2016, p. 146.)

24.   On August 18, 2006, the Haegers answered Goodyear's contention interrogatories. (**Exhibit 8**.)

25.   The Haegers set forth their theory of the defect in responding to the interrogatories stating:

Plaintiffs are unable to identify each legal theory and related facts which may ultimately be applicable regarding Goodyear's liability for the injuries because no information has been disclosed by Goodyear. More particularly, Goodyear's initial disclosure statement fails to identify any records in its possession which it knows to be relevant regarding the tire model, its design, its design use, warranty history, consumer complaints, failure history, similar accidents, marketing literature, or even a single communication between Goodyear and the other defendants.

\* \* \*

The limited information available reveals that the tire which separated and produced the injuries in this case was the G159. This tire was specifically designed for pick-up and delivery trucks in commercial service. Nonetheless Goodyear marketed this tire for Class A motorhome use, which was an inappropriate use of the original design of the G159.

\* \* \*

There are fundamental differences between a tire which is designed for pick-up and delivery trucks and those used in Class A motorhomes. Delivery trucks start and stop on a regular basis and travel at predominately lower speeds. As a consequence, the tire is exposed to significantly less heat. Prolonged heat causes degradation of the tire which, under appropriate circumstances, can lead to tire failure and tread separation, even when the tire is properly inflated.

When the G159 is utilized in a freeway application it regularly travels at freeway speeds of approximately 75 mph. 75 mph is the maximum speed rating for the G159. When utilized in Class A motorhome/freeway applications, the tire is operating at maximum loads and at maximum speeds, producing heat and degradation to which the tire was not designed to endure, leading to its premature failure.

The … G159 was removed from recreational vehicle utilization by Goodyear and replaced with the G670 RV tire. While the design differences between the tires have yet to be disclosed, preliminary information shows that the G670 tire, used in this application, had greater capacity to carry the weight of the motorhome and operate under freeway conditions, including differences in tread designs specifically adopted to dissipate heat in the tire.

It was a breach of Goodyear's duty to the traveling public to originally utilize the G159 in a Class A motorhome setting. Soon after Goodyear began marketing the tire in this application, upon information and belief, problems associated with premature tire failure and tread separation were noted. Goodyear's negligence included the failure to appropriately warn consumers of the design

limits of the G159.  It also failed to provide any information to the consumers of the failure history which was developing in the field. Goodyear was obligated to warn its customers, which were known and/or easily identified, of the problems it was experiencing which threatened their personal safety….   Goodyear's failure to provide post-failure warnings to consumers of its product deprived them of an opportunity to make a meaningful choice to update their tire to an appropriate product for recreational vehicle use.

26.    In August 2006, the parties notified the Court of their first discovery dispute (Doc. 49).  It centered around terms of a protective order.  The Haegers wanted a sharing provision contained in the protective order, suggesting it was necessary to insure that all parties litigating cases against Goodyear would receive appropriate and complete data in similarly situated cases.  The Court rejected the request emphasizing that "Every officer before this Court has an obligation to provide all relevant discovery."  (Doc. 53 at 10.)  The Court observed that the Federal Rules already provided:  "That anything that is relevant must be turned over to counsel and all the parties so that there was no need for a sharing provision."  As of August 2006, all counsel were expressly aware of the Court's expectations regarding discovery.  (*Haeger v. Goodyear,* 906 F. Supp.2d 938, 943 (D. Ariz. 2012).)

27.    After the Haegers answered Goodyear's discovery requests, on September 21, 2006, Haegers' counsel wrote to Goodyear and expressed concerns regarding the global failure to disclose any information in Goodyear's Disclosure Statement.  Goodyear was asked to supplement and identify witnesses familiar with all forms of failure data, which presumably Goodyear would use as part of its defense.  (**Exhibit 9**.)  Goodyear provided no supplementation.  *Haeger* at 942.

28.    On September 22, 2006, Plaintiffs submitted their First Request for Production of Documents to Goodyear and its First Set of Interrogatories.

1    29.    On September 26, 2006, Goodyear's counsel agreed to limit what it
2 would disclose "per our usual practice upon an initial response" to only a narrow
3 incomplete universe of data.  (**Exhibit 10**.)

4    30.    Prior to responding to discovery, on October 12, 2006, Goodyear's
5 counsel met with Sim Ford to discuss Goodyear communications with NHTSA
6 regarding the G159.  (**Exhibit 11**.)

7    31.    On October 23, 2006, Goodyear provided its response to the Haegers'
8 discovery requests.  It identified 16 general objections and thereafter objected to each
9 and every request for information or documents.  (**Exhibits 12 and 13**.)

10    32.    On November 1, 2006, Goodyear filed its Supplemental Response to
11 the Plaintiffs' First Request for Production of Documents.  (**Exhibit 14**.)  Goodyear
12 maintained its 16 general objections and its objections to each of the 39 requests for
13 production, though it did provide some supplemental responses.

14    33.    Goodyear crafted its own definition of relevance.  When it responded,
15 it generally limited its responses to the Subject Vehicle (a 1999 Gulf Stream Scenic
16 Cruiser) involved in the accident and the Subject Time Frame, limiting production of
17 information to the dates between when the Subject Tire was manufactured
18 (November 1998) and the date of the accident (June 2003).  Goodyear's general
19 objections also included the assertion that the plaintiffs had failed to identify a
20 defect.[5]

21    34.    Goodyear chose this approach to limit disclosure of failure data,
22 including property damage claims, adjustments (warranty returns) and injury claims.
23 (**Exhibit 15**.)

24

25
_____
[5] The parties had agreed to limit Goodyear's production to the Subject Tire (the
26 G159 275/70R22.5 at issue).

35.     Judge Silver's published Opinion established that the answers to Goodyear's contention interrogatories set forth the defect theory and that Goodyear's utilization of this technique of objection was part of its general strategy to obstruct and delay discovery.  (*Haeger v. Goodyear*, 906 F. Supp.2d 938, 942 (D. Ct. 2012).)

36.     Request for Production No. 9 sought:  "All warranty claims involving G159 tires involving tread separation."   The supplemental response provided:  "Subject to and without waiving the foregoing objections, in a good faith spirit of cooperation, Goodyear will produce, subject to the protective order entered in this case, a summary of Goodyear's crown area adjustment data for the Subject Tire for the Subject Time Frame."[6]

37.     Request for Production No. 10 sought consumer complaint documentation.   Again, Goodyear's supplemental response, utilizing the same language, indicated Goodyear would produce a summary of crown area adjustment data for the Subject Tire for The Subject Time Frame.

38.     Request for Production No. 11 sought all accident records involving G159 tires involving tread separation. Goodyear's supplemental response indicated Goodyear would produce the claims involving Gulf Stream motorhomes from the date the failed tire was manufactured up until the date of the accident.

39.     Request for Production No. 22 sought:  "All communications between Goodyear and the National Highway Traffic Safety Administration which relate to the G159 tire."   Goodyear's supplemental response provided:  "Goodyear states that the Subject Tire has not been the subject of a NHTSA investigation to the best of its knowledge and that at the present time it is not aware of any documents responsive to this request for the Subject Time Frame."

---

[6] Goodyear in this instance did not limit its production to "The Subject Vehicle," (a Gulfstream Scenic Cruiser).

40.     Request for Production No. 24 sought:  "All communications between Goodyear and any government regulatory agency, including the U.S. Department of Transportation regarding the G159 tire."   Goodyear's supplemental response provided:  "Goodyear states that the Subject Tire has not been the subject of a DOT investigation to the best of its knowledge and that at the present time it is not aware of any documents responsive to this request for the Subject Time Frame."

41.     Request for Production No. 32 sought:  "All documents which relate to any report made to NHTSA regarding the G159."   Goodyear's supplemental response provided:  "Goodyear states the Subject Tire has not been the subject of a NHTSA investigation to the best of its knowledge and that at the present time it is not aware of any documents responsive to this request for the Subject Time Frame."

42.     Request for Production No. 35 sought all property damage claim data records maintained for G159 tires.   Goodyear's supplemental response provided: "Goodyear will produce … a list of all property damage claims involving tread and/or belt separation involving the Subject Tire on the Subject Vehicle for the Subject Time frame without disclosing the names of any customers who have not initiated litigation."

43.     Interrogatory No. 4 asked:  "Identify the total sales volume during the years of production of G159 tires which were known to be sold for use in motorhome applications…."   Goodyear's supplemental response stated:  "Goodyear states that it will produce … the annual production numbers of the Subject Tire manufactured at its Danville, Virginia plant through the date of the accident alleged in the Complaint, but Goodyear is unable to determine the number of those tires which were specifically sold for motorhome applications."  (**Exhibit 16**.)

44.     The answers to interrogatories were verified by Bertram Bell, Associate General Counsel of the Goodyear Tire & Rubber Company.

45.     On November 1, 2006, (the same day Goodyear supplemented its discovery responses) National Coordinating Counsel emailed Goodyear Associate General Counsel Okey stating in reference to Request for Production No. 22: "We have limited the response so as to not disclose anything about the NHTSA peer review request." (**Exhibit 17**.)

46.     Goodyear thereafter disclosed 143 crown separations (aka tread separations) for the G159 between the date the Haegers' tire was manufactured (1998) and the date of the accident (2003); six (6) property damage claims, zero (0) bodily injury claims and one (1) lawsuit. (**Exhibit 18**.)

47.     On November 9, 2006, Goodyear's counsel was advised of the multiple issues related to Goodyear's inadequate supplemental responses. (**Exhibit 19**.)

48.     On November 29, 2006, Goodyear advised, "Goodyear will respond by producing a list of property damage claims for crown separations from the date of first production (1996) to the date of the accident (2003)." (**Exhibit 20**.)

49.     On December 20, 2006, Goodyear was advised of continuing issues associated with deficient discovery responses. (**Exhibit 21**.)  The letter called to Goodyear's attention the Haegers' awareness of a defect investigation initiated by NHTSA which required Goodyear to disclose data regarding the G159.  Goodyear never responded to this letter.

50.     On December 28, 2006, the parties filed a Joint Statement of Discovery Dispute whereby the Haegers requested the Court compel further disclosures.  (Doc. 97.)   The Court was advised, that among other things, the document requests included warranty claims, consumer complaints, accident reports, property damage, litigation files and government communications regarding the tires.  The Court was advised that Goodyear had attempted to narrow the scope of relevance by limiting production to the date commencing when the Haegers' tire was manufactured and

ending on the date of the accident (the Subject Time Frame) and limiting responses to only the Gulfstream Scenic Cruiser model involved in the Haeger accident (the Subject Vehicle).  The Court was informed that in April 2006 Goodyear was required to produce much of the information sought in response to an Office of Defect Investigation from NHTSA.

Goodyear represented to the Court that the plaintiffs had not disclosed a defect theory which makes the requests relevant.  As to the NHTSA investigation, Goodyear asserted "The submission of Goodyear's proprietary data regarding a variety of tire products to NHTSA for that agency's investigation of a different tire company's product has nothing to suggest that any portion of that submission is relevant to this case, or, more to the point, 'necessary'."  (Doc. 97.)

51.  On January 1, 2007, Goodyear's local counsel communicated with National Coordinating Counsel regarding concerns expressed in the December 20, 2006 letter.  The email addresses the demand for information produced to NHTSA by Goodyear:

> 9.  ODI document request.  Why do we contend that NONE of this data is relevant.  What's our argument to the court going to be?  (Original emphasis.)

(**Exhibit 22**, p. 1, ¶ 9.)

52.  The discovery dispute hearing with Goodyear addressed the refusal to disclose information associated with Goodyear's G670, a tire specifically manufactured by Goodyear for recreational vehicles (motorhomes),[7] Goodyear's refusal to disclose data Goodyear submitted to NHTSA in 2006 regarding production numbers and failure rates for a limited class of Goodyear tires (those which fit on the 22.5-inch rims) and the supplementation of Goodyear's discovery responses

---

[7] The G159 ceased production in January 2003, the G670, of the same size, was thereafter sold by Goodyear for RVs.

regarding warranty claims (adjustments) and property damage claims arising out of G159 tread separations, to commence on the date the G159 was first manufactured in 1996 up to the date of Goodyear's response.  (Doc. 116, January 3, 2007 Transcript of Proceedings.)

53.    The following exchange took place:

MR. HANCOCK:  There is no showing to this court that the requests NHTSA made are relevant to this case.

THE COURT:  What are the requests that NHTSA made?

MR. HANCOCK:  … it was a lot of other proprietary information about a lot of products.  The point is this:  …We were asked for everything you submitted to NHTSA in an investigation that NHTSA was running on a competitor production….

It also involves only the confidential portions of that, which we know, from at least the government agency, were proprietary and subject to trade secret … discovery of trade secrets under Arizona law and under a federal law generally require a showing of relevance and necessity.  Where is the affidavit from plaintiffs' expert saying discovery and all of Goodyear's tire products of all steel truck tires is somehow necessary for me to reach opinions in this case?  …

THE COURT:  What I would like to know, however, is whether or not the NHTSA documents and the – what was produced to NHTSA has any relevancy to this case, in other words, was some of the information or a portion of the information that was submitted did it relate to the tire in this case?

MR. HANCOCK:  Your Honor, I believe that there is data somewhere in there that relates to the G159 product that is at issue because when you ask for all information about all steel tires, you'll get some data about this particular product.  It's, again, like asking for and tell me everything about your passenger car lines.  And you'll get Ford Expeditions in there by definition.

THE COURT:  And I'm only assuming, without really knowing, not having seen these documents or these requests, that NHTSA had something in mind when they ask these questions of Goodyear.  And if what they had in mind related to the G159 tire and its potential defects or its inability to handle the weight factor of a motorhome, then that certainly would have some relevancy.  If it's within the custody and control of your client, then I would be inclined to ask you or order you to provide that information to plaintiffs' counsel.  But that's what I'm missing here.

MR. HANCOCK:  Your Honor, I can answer that question.  What I do know about the Office of Defect's Investigation request to Goodyear, Goodyear was not being investigated.  <u>No Goodyear tire was being investigated.  The G159 tire that's involved in this case was not being investigated.</u>  They were gathering comparison data for their investigation of Toyo.

\* \* \*

… I can also advise the Court that the result of the investigation was that NHTSA not only closed their investigation of Toyo, but came out with a finding that specifically said the Toyo tire is not defective.  So presumably whatever they were doing in gathering my company's information to look at Toyo ended up saying, no, Toyo doesn't have a problem.  And we're not claiming its defective.

\* \* \*

… Your Honor, the bottom line is, as requested, it <u>looks like a fishing expedition to us.  Hey, somebody else was investigating something else and they asked you for a lot of information about a lot of products.  Why don't you just give that to us.  And the answer is, there is no showing of relevance and necessity.</u>

(Emphasis supplied) (Doc. 116, Transcript at pp. 20-24.)

54.     Based upon additional arguments of Goodyear's counsel, the Court declined discovery regarding the Goodyear G670.  (Doc. 116, Transcript at p. 29.) As to the requested NHTSA information, the Court stated:

Now on the question and including to make sure it's clear with respect to the NHTSA information, I see <u>that based upon what Mr. Hancock has said</u> was the – the issue that was presented to them by NHTSA, <u>there's nothing there</u>.  Now I would agree with you <u>if</u> it was in their custody and control, their client's custody and control, <u>the information was relevant</u> to your input, <u>then I would require it.  But I don't see it so that's the answer today</u>.

(Emphasis supplied) (Doc. 116, Transcript at p. 41.)

55.     As to the production of additional information regarding warranty and property damage claims the Court was advised:

MR. KURTZ:  We have been asking for data after the date of the accident because it is discoverable evidence as to the strict liability defect claim.  You know, the volume of failures, there is nothing magical about the accident date.  It bears upon the defective design of the tire.  Some of these motorhomes haven't been used very much.  So

1   I might have a thousand of them fail after the date of the accident
2   under the exact same circumstances, and that's why we seek the data
    up to now.

3   (Doc. 116, Transcript at pp. 31-32.)

4          Discussions continued between the Court and counsel.

5          THE COURT:  …  The question is, whether or not the documentation
    needs to be produced after the date of the accident.
6
           MR. KURTZ:  Yes your Honor.
7
           THE COURT:  To the date.  And is there such data available Mr.
8   Hancock?

9          MR. HANCOCK:  Your Honor it depends upon what your – which of
    the various discovery requests plaintiffs' made you're talking about.
10   In other words, what Goodyear said, generally speaking, it's that the
    tire is made to a specification.   We've made changes to the
11   specification but we started making it in 1996.  We quit making it in
    2003.  We've produced all of the data we had as of the date of the
12   accident so you can say, knew or should have known through
    negligence, or that's enough data so that there is some kind of
13   problem in the production, it's obvious.

14   (Emphasis supplied) (Doc. 116, Transcript at pp. 32-33.)

15          THE COURT:  And, Mr. Kurtz, what is it that you think exists that's
    relevant beyond the date of the accident?  What specifically are you
16   asking for?  And I think it's very important that I know what you
    asked for in your discovery, in your interrogatories, your requests for
17   production of documents … that you haven't received that's relevant.

18          MR. KURTZ:  We've asked for, your Honor, amongst the categories
    for the warranty claims made on those tires after the date of the
19   accident that show further tread separations in the field.

20          THE COURT:  So you specifically said that?

21          MR. KURTZ:  Yes.

22                                    *   *   *

23          THE COURT:  Well, let me just go through it.  That appears to me, at
    this point to be relevant.  What else?
24
           MR. KURTZ:  We asked for all of the … warranty claims, property
25   damage claims, they –

26

Plaintiffs' Ssof                          - 17 -

THE COURT:  But how is warranty claims and property damage claims going to relate to the tread separation issue?

MR. KURTZ:  We have only asked for them for tread separations your Honor.

THE COURT:  Well then if you asked for tread separations then at this point, Mr. Hancock, I'm inclined to grant that extent of the request by the plaintiffs.

(Doc. 116, Transcript at pp. 32-35.)

After addressing the discovery dispute between Plaintiffs and Co-Defendants Gulf Stream and Spartan, the Court made sure that its determination was clear.

THE COURT:  Alright, Mr. Hancock, any lack of clarity?

MR. HANCOCK:  No lack of clarity.  As I understand it, the Court has denied the Motion but has granted with respect to my client Goodyear with respect to the warranty claims and property damage claims for this model tire **and** changed the cutoff date from the date of the accident to forward, whenever we respond or ask us to supplement with that.

THE COURT:  That's correct.

(Emphasis supplied.)  (Doc. 116, Transcript at p. 54.)

56.     On March 2, 2007, Goodyear disclosed GY-HAEGER001125-001128. Though Goodyear provided a summary of warranty returns, by year of production, for crown separations (tread separations) commencing on the date the G159 was manufactured up to the date of its response, it <u>limited</u> its disclosure of property damage claims to only those involving Gulfstream motorhomes (14 claims), in spite of the clarity of the Court's order.  (Emphasis supplied.)  (**Exhibit 23**.)

57.     Goodyear never further supplemented its discovery answers beyond what was set forth in Goodyear's November 1, 2006 Supplemental Response to the Haegers' First Request for Production and First Set of Nonuniform Interrogatories.

58.     On April 6, 2007, the Court held a status conference.

59.     The following exchange with Goodyear took place:

THE COURT:  Let me ask defense counsel, is there any internal documentation that is available that has been requested that your client has – clients <u>have not</u> provided?

MR. HANCOCK:  Your Honor, speaking on behalf of Goodyear, we have responded to all outstanding discovery and those responses have been outstanding for some time and, you know, if a document shows up, we will of course produce it and supplement our answers but I think we are done or nearly done.

THE COURT:  And your client has provided certification that is required by the rule?

MR. HANCOCK:  Correct.

(Emphasis supplied.)  (Doc. 146, Transcript at pp. 12-13.)

60.     Goodyear's counsel's statements were false.  (*Haeger v. Goodyear*, 906 F. Supp.2d 938, 947 (D. Ariz. 2012).)  At the time of those representations it had already been established that Goodyear was withholding requested test data.  *Id.* Goodyear was also withholding the underlying warranty claim records and property damage claims which the Court had ordered for production in January 2007.

61.     On June 1, 2007, the parties lodged another Joint Statement of Discovery Dispute.  (Doc. 225.)  The dispute was multifaceted.  Included with the presentation was Goodyear's failure to produce warranty and property damage claims regarding the G159 in accord with the January 3, 2007 ruling by the Court setting forth plaintiffs' entitlement to such records.

62.     The following exchange took place at the hearing:

MR. KURTZ:  Part of the parcel of the completion this factual discovery is the acquisition of the warranty files and the property damage claims your Honor ordered Goodyear to produce last January… I need a date certain order for you to make them produce that which you've ordered.  It's been six months.  I should have had it a long time ago.

*   *   *

THE COURT:  Is this information necessary for the deposition of Mr. Olsen?

1    MR. KURTZ:  It is necessary for all expert depositions, your Honor.

2                              *   *   *

3    THE COURT:  Have you turned over everything that I have required
     as to my decision in January?
4
     MR. HANCOCK:  Yes, your Honor.
5
     THE COURT:  Okay.  It looks like you have everything Mr. Kurtz.
6
7    MR. KURTZ:  Well your Honor, Mr. Hancock is just being less than
     candid with you.  I don't have anything and I haven't gotten anything.
     And I have to keep asking for it.  And Mr. Hancock knows exactly
8    what I don't have.

9    THE COURT:  Well hold on.  Is it because Mr. Hancock has nothing?

10   MR. HANCOCK:  No, your Honor.  It's because he's expanding what
     he was demanding and what was raised in January….
11
                              *   *   *
12
13   THE COURT:  Okay.  The backup data and all of that relating to the
     more recent problems with this tire, is that something you can't
14   produce in a short period of time?

15   MR. HANCOCK:  Your Honor, I don't believe I can produce it in a
     short period of time.  I don't know what does and does not exist,
16   because this was an issue that was resolved back in January.

17                             *   *   *

18   THE COURT:  But does this backup data relate to the incidents which
     occurred after that we talked about in January?
19
     MR. HANCOCK:  No.  I think he is asking for every claim that was
20   ever made for property damage on this tire and can give you us the
     entire compendium of information you have and for any lawsuit give
21   me the entire collection of the lawsuit.  That's what he's after.

22   THE COURT:  Mr. Kurtz are you asking for that?

23   MR. KURTZ:  As your Honor will recall, the Court – the inquiry we
     had was I'd asked for the warranty … claim data and the property
24   damage claim data for the specific subject tire.  Your Honor ordered it
     be produced.  What Mr. Hancock gave me was a list of Gulf Stream
25   property damage claims and excluded all other claims for the dead and
     wounded associated with this tire.

26

And the warranty data, he gave me a summary of adjustments.  Now, Mr. Hancock knows there is a form for every claimed tire failure that is submitted to Goodyear.  It comes in a G345 Claim Form.

And all those warranty claims are submitted to Goodyear and hard documented, easily accessible and already produced forms in other cases.

* * *

And as Plaintiffs' counsel, we have been asking for this stuff and your ordered it a long time ago and it was not complicated and it is certainly that to which we are entitled.

* * *

THE COURT:  The documentation might be available, but most of it has been thrown away?  But the documentation might be in some warehouse of Goodyear?

MR. HANCOCK:  I don't know the answer to those questions, your Honor.

THE COURT:  Let's find the answer to that, whether it might be available, how much time it will take, whether or not it would be unreasonably burdensome for Goodyear to ascertain whether or not the documentation exists somewhere in some place in some warehouse.  So that's what we need.

MR. HANCOCK:  Thank you, your Honor.

(Doc. 243, Transcript of Proceedings, pp. 33-40.)

63.    On September 15, 2007, the parties submitted another Joint Statement regarding outstanding discovery issues.  (Doc. 345.)  It addressed, among other things, Goodyear's continued failure to produce warranty and property damage claim data.  (*Id.* at p. 2, #5.)  The dispute also addressed Goodyear's failure to appropriately prepare their 30(b)(6) witness, including his inability to provide adequate information relating to warranty and property damage claims.  The following exchange took place during the hearing on October 19, 2007, addressing those issues:

THE COURT:  According to Mr. O'Connor, those documents haven't been produced.  It doesn't seem to me that you really need a 30(b)(6) witness to read those documents unless you know what's in the

1   document first.  <u>But it is your position those documents need not be
2   produced</u>?

3   MR. HANCOCK:  Correct, your Honor.

4   THE COURT:  And that's because –

5   MR. HANCOCK:  <u>Your Honor there is no court order requiring their
    production</u>.  They were raised by Mr. O'Connor's predecessor.  If you
6   go to the Docket 97, you'll see a three-page scope of discovery brief
    last December that raised that.  <u>We argued it in January and you
7   granted one issue which is you said, "Mr. Hancock, I want you to
    change the chronological scope of what you produced meaning you
8   started this date and cut it off at this date.  Mr. Hancock.  Broaden it."
    We produced everything again on all those things on March 2, 2007</u>.

9                                        *   *   *

10  THE COURT:  Now, with respect to those documents, is there any
    way, Mr. Hancock to interpret any request that was previously made
11  to include these documents?

12  MR. HANCOCK:  Yes, your Honor.

13  THE COURT:  What was that?

14  MR. HANCOCK:  That was a First Request for Production which was
    made and answered in November 2006, which was subsequently the
15  subject of motions where motions to get this stuff was denied.

16  THE COURT:    Okay.    So that's what I wondered.    <u>Alright.
    Mr. O'Connor</u>.  <u>You're new to this case</u>.  If that's the case, <u>I don't
17  want to hear about it again</u>.  As I've mentioned, <u>it is not appropriate to
    have a witness</u>, a 30(b)(6) witness, there to testify to <u>give an opinion
18  about documents</u> and his examination of those documents <u>where I
    have ordered that they are not required to be produced</u>.
19
    MR. O'CONNOR:  I don't think, your Honor – and I do apologize.  <u>I
20  don't think that's an accurate indication</u> –

21  THE COURT:  Well, I'm not going to deal with something that's
    accurate or inaccurate.  Mr. O'Connor, you've been before me in the
22  past.    I know you have accepted an assumed an enormous
    responsibility here by picking up somebody else's case.  But that is
23  the responsibility of being apprised of everything that occurred before
    is critical.
24
    <u>Mr. Hancock has got more experience.  I've not had any experience
25  with Mr. Hancock where he would misstate what this Court has said</u>.
    You need to review everything that I have ruled on before.  And <u>if I
26  said these documents</u>, the inspection records, the photographs,

whatever else that you asked this witness to review <u>are not required to</u>
<u>be provided then you're not entitled to have a 30(b)(6) witness do</u>
<u>what you requested</u>.

(Emphasis supplied) (Doc. 361, October 19, 2007 Transcript of Proceedings, pp. 33-37.)

64.    The first scheduling order made the Court's intentions clear.  "Failure to timely supplement pursuant to Rule 26(e) … may result in … sanctions including the inherent power of the Court."  (Doc. 58, fn. 2.)  "This Court views compliance with the provisions of this order as critical to its case management responsibilities and the responsibilities of the parties under F.R.C.P. 1."  (*Id.* at p. 5.)  The final date for supplementation of discovery was later extended to November 7, 2012. Goodyear did not supplement its preceding answers to interrogatories or responses to requests for production.  The ordered production of property damage claims never occurred.  The 2006 NHTSA data remained concealed.  The true G159 failure data remained concealed.

65.    On the first day of trial in April 2010, *Haeger* I was settled. (Doc. 926.)

66.    In May 2011, the Haegers filed their Motion for Sanctions for newly discovered evidence of fraud during the course of discovery.  (Doc. 938.)

67.    It was discovered that Goodyear had concealed requested test data and made multiple related misrepresentations to the Court during the course of *Haeger* I. (Doc. 949.)

68.    The Haegers moved to compel the production of previously concealed test data.  (Doc. 949.)

69.    Goodyear opposed the Motion to Compel asserting that the settlement agreement/release between the parties prohibited further proceedings.  (Doc. 951.)

70.     The Haegers' Reply set forth the law on the Court's inherent authority and why release was irrelevant.  (Doc. 952.)

71.     Over Goodyear's objections, the Court entered its Order finding, "There are serious questions regarding defendants' conduct throughout this case and it is well established that 'a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud.' *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)."  The Court ordered Goodyear to produce the concealed test results.  (Doc. 954.)

72.     After multiple rounds of briefing, an evidentiary hearing, the production of 13,000 documents related to concealed test data, depositions of those involved in concealing the test data, and a final round of briefs supported by Plaintiffs' Supplemental Statement of Facts, the Court published its decision on November 8, 2012.

73.     The Court set forth detailed findings of fact regarding the abundant clear and convincing evidence of Goodyear's bad faith conduct throughout the course of *Haeger* I and during the sanction proceedings.  The findings included deceptions during the evidentiary hearing, misleading and false declarations submitted to the Court, deceptive deposition testimony by Goodyear's 30(b)(6) witness and associated false and knowingly frivolous arguments throughout the sanction proceedings.

74.     In accord with instructions within the District Court's decision of November 2012, the Plaintiffs filed their new complaint in the Maricopa County Superior Court on May 20, 2013.   Goodyear, its local counsel, its National Coordinating Counsel and their law firms were joined as defendants.

75.     The Complaint set forth a detailed factual presentation (over 300 paragraphs) as the foundation for the legal claims advanced, based upon what was then known.  (**Exhibit 24**.)

76.     At the request of the defendants, the Maricopa County action was stayed due to the pending Ninth Circuit appeal regarding *Haeger* I.  (**Exhibit 25**, 01/17/2014 Order.)

77.     While the stay was pending, on December 19, 2014, the Haegers moved to compel Goodyear's production of information to facilitate evidence preservation, including litigation information, property damage and bodily injury claims and acquisition of the transcript of *Schalmo v. Goodyear*, the only G159 case whichever proceeded to trial.  (**Exhibit 26**, 12/19/2014 Motion.)

78.     Goodyear asserted that the identification of lawsuits and property damage claims data was "not relevant."   (**Exhibit 27**, 01/12/2015 Goodyear Opposition to Motion to Compel, p. 7.)

79.     On January 21, 2015, the Haegers filed their Reply Memorandum identifying the unique relevance of the requested data.  (**Exhibit 28**.)

80.     On April 23, 2015, the Court issued its Order granting the Motion to Compel.  The Court found, "information about other G159 tire claims and related decision-making is reasonably calculated to lead to the discovery of admissible evidence concerning damages."   Goodyear was required to answer and respond to interrogatories and requests for production.  (**Exhibit 29**, 04/23/2015 Order.)

81.     Goodyear produced documents in response to the Court's Order, which included some property damage and bodily injury claim information and a redacted version of the *Schalmo* trial transcript.

82.     On July 2, 2015, the Haegers filed their Motion for Relief from Goodyear Protective Orders in various G159 cases and a Motion to Compel

1   Goodyear's further production to address deficiencies necessary to comply with the

2   Court's April 23, 2015 Order.  (**Exhibit 30**, 07/02/2015 Motion.)

3        83.    In July 2015, a divided panel of the Ninth Circuit affirmed the District

4   Court's findings of fact and conclusions of law.  (*Haeger v. Goodyear*, 813 F.3d

5   1233 (9th Cir. 2015.))

6        84.    On July 22, 2015, Goodyear filed its opposition to the Haegers'

7   requested relief from the G159 protective orders and response to the motion to

8   compel.  (**Exhibit 31**.)

9        85.    Goodyear asserted that Rule 26.1 of the Arizona Rules of Civil

10  Procedure did not require Goodyear to disclose data for which Goodyear claims

11  confidentiality under protective orders in various G159 cases across the country.

12  (*Id.*)

13       86.    On July 31, 2015, the Haegers filed their Reply to Goodyear's response

14  regarding relief from the protective orders and the associated motion to compel

15  further disclosures to comply with the Court's April 2015 Order.  (**Exhibit 32**.)

16       87.    The Haegers maintained that they were entitled pursuant to Rule 26(b)

17  of the Arizona Rules of Procedure to the discovery of any matter, not privileged,

18  which is reasonably calculated to lead to the discovery of admissible evidence.  The

19  pleadings set forth Goodyear's various legal obligations related to the analysis of

20  failure and claim data which would suggest there was a defect in the G159 which

21  affected motor vehicle safety.  (*Id.*)

22       88.    In 2014, Goodyear and its attorneys filed a Motion to Dismiss the

23  Haegers' claims, asserting that the release in *Haeger* I precluded further litigation

24  regarding willful deceptions during *Haeger* I.  On September 10, 2015 the Court

25  entered its order denying the Defendants' Motion to Dismiss the Haegers' fraud

26

1   claim, finding there are cognizable claims for relief for misconduct occurring during

2   litigation.  (**Exhibit 33**.)

3        89.   On November 25, 2015, the Court entered its Order granting the

4   Haegers' request for relief from the protective orders Goodyear had acquired in

5   related G159 litigation.  The Court found specifically that, "information about other

6   claims involving the G159 tire is potentially relevant and admissible in more than

7   one way."  The Court granted the Motion to Compel and ordered the production of

8   an unredacted version of the *Schalmo* transcript, the production of a full list of

9   protective orders, the identification of settlement agreements, and specifically

10  authorized disclosure to the NHTSA all information discovered by the Haegers

11  during the course of litigation relevant to the safety of the G159.  It also compelled

12  Goodyear to supplement various discovery responses.  (**Exhibit 34**.)

13       90.   On November 16, 2015, the Haegers filed a motion to determine

14  Goodyear had waived attorney-client and work product privileges and filed an

15  associated motion to compel related to various deficiencies in Goodyear's responses

16  to requests for production.  (**Exhibit 35**.)

17       91.   On April 18, 2016, the Court entered its order finding Goodyear had

18  waived attorney-client and work product privileges based on its actions during the

19  course of *Haeger* I.  (**Exhibit 36**.)

20       92.   On September 6, 2016, the Haegers filed their next motion to compel

21  seeking production of Goodyear's communications with NHTSA in May 2006,

22  which were first requested in September 2006, during *Haeger* I.  (**Exhibit 37**.)

23       93.   Goodyear responded that the pursuit constituted "wasteful conduct."  It

24  maintained that the request for the production of NHTSA communications was a

25  pursuit for documents "they knew were *deemed irrelevant* by Judge Silver."

26  (Original emphasis.)  (**Exhibit 38**.)

1  94.    Goodyear maintained the documents were "not discoverable" and "not

2  relevant."  (*Id.* at p. 3.)

3  95.    On September 6, 2016, Goodyear agreed to produce property damage

4  claims documents (approximately 6,000 pages) which were compelled to be

5  produced in *Woods v. Goodyear* in August 2007, in exchange for the Haegers'

6  agreement to seek no further property damage data.  (**Exhibit 39**, September 6, 2016

7  correspondence from James Brogan.)

8  96.    On October 5, 2016, the Haegers filed their Reply regarding the

9  production of NHTSA documentation.   The Haegers maintained the information

10  should have long ago been disclosed pursuant to Rule 26.1 A.R.C.P. and advised,

11  "The Haegers' interest is whether Goodyear was forthcoming in response to precise

12  government demands for information."   "How Goodyear responded to the NHTSA

13  inquiry will reveal what was concealed from the government."  (**Exhibit 40**.)

14  97.    On October 7, 2016, the Court granted the Motion to Compel requiring

15  production of the information Goodyear produced in response to NHTSA's demand

16  in 2006.  (**Exhibit 41**.)

17  98.    Goodyear failed to timely comply with the Court's Order.  After nine

18  weeks, on December 16, 2016, the Haegers filed their Notification of Outstanding

19  Production required for Goodyear to comply with the Court's October 7, 2016 Order.

20  (**Exhibit 42**.)

21  99.    The Court was informed that Goodyear claimed it could not locate the

22  information provided to comply with NHTSA's production demands in 2006.

23  Ultimately, Goodyear agreed that it would acquire the information from NHTSA.

24  (*Id.*)

25  100.   On December 20, 2016, Goodyear forwarded 13 pages of documents

26  that it represented were the totality of the NHTSA submission.  (**Exhibit 43**.)

101.    On December 21, 2016, the Haegers advised they had serious concerns regarding omitted data.  (**Exhibit 44**.)

102.    On December 22, 2016, counsel communicated with NHTSA, advising them of the need to verify complete production in compliance with the Court's Order requiring disclosure of what Goodyear submitted to NHTSA.  (**Exhibit 45**.)

103.    On January 3, 2017, NHTSA advised that the information Goodyear recently disclosed was the only data submitted to the regulator in response to the 2006 NHTSA production requirement.  (**Exhibit 46**.)

104.    On January 25, 2017, three weeks after the long sought NHTSA data was finally disclosed from 2006, *Haeger* II was confidentially settled.  (**Exhibit 47**, redacted Term Sheet.)

105.    The settlement terms specified that the ongoing sanction proceedings were "not to be impacted" by the settlement, thereby preserving the Haegers' capacity to pursue attorney fee claims.  (*Id.*)

106.    In March 2017, Spartan Motors moved to intervene in *Haeger* II to gain access to confidential documents in order to fully participate in the Federal Court proceedings, which were expected to follow the soon-to-be-issued Supreme Court Opinion.

107.    On April 26, 2017, the final settlement agreement between the Haegers and Goodyear was executed.  (**Exhibit 48** (redacted).)  It specifies:

> The parties acknowledge that the Haeger Sanction Proceedings (defined as the post settlement proceedings of *Haeger* I, in the United States District Court which remain pending in the Supreme Court of the United States) are not impacted by this settlement.

108.    On July 6, 2017, the Center for Auto Safety filed a Motion to Intervene in *Haeger* II to access materials which Goodyear claimed to be confidential.

109.    On July 7, 2017, Judge Hannah held a hearing to address Goodyear's

claims of confidentiality and its endeavor to prohibit Spartan from accessing such materials or communicating with Haegers' counsel. The Court ruled that the protective order the Court issued in November 2015 "cannot stand" and overruled Goodyear's claims of confidentiality. The Court stated:

> The Court has become much more familiar with the facts of this case… The Court also notes that the Court did make an exception for disclosure to NHTSA and the reason was that the Court at that time was concerned about the public welfare. The information I've heard since and the information that has been presented today convinces me that the possible risks to the public health and safety is a strong reason to vacate this protective order.

> So it is ordered as follows: … The Court finds that Goodyear has not shown a compelling interest … which is the standard under the law, for sealing the dispositive motions in the case….

(**Exhibit 49**, Transcript of Proceedings, pp. 69-73.)

110. The Court ordered previously sealed documents unsealed (with a few exceptions). (**Exhibit 50**.)

111. The Court vacated the protective order in the case in its entirety. (*Id.* at p. 72.) The Court similarly required Goodyear to make the documents previously claimed confidential available to Spartan. (**Exhibit 49** at p. 73.)

112. On July 10, 2017, in accord with the Court's authority and the settlement agreement, counsel submitted its communication to NHTSA setting forth 29 pages of facts which set forth much of what was discovered during the preceding years of litigation involving the G159, supported by over 6,000 pages of exhibits. (**Exhibit 51**.) The letter sets forth:

- How Goodyear used protective orders to prohibit disclosure to NHTSA;

- The actual failure data, property damage, injury and death claims long concealed from NHTSA and in all other G159 cases;

- The annual failures between 1996-2015 for every claim category;

- The number of motorhome manufacturers and models involved in G159 failures;

- G159 failure contrast with other tires deemed defective;

- Goodyear testimony as to why nothing was done regarding the G159 and who knew of the failure history;

- Goodyear's deceptive disclosures to NHTSA in 2006;

- Design purpose, testing and temperature limitations of the G159;

- Concealed modifications to the G159;

- Financial circumstances surrounding Goodyear and compensation of senior management.

113.   The Court held a hearing on November 17, 2017, to address the Center for Auto Safety's similar request to unseal the records that Goodyear claimed to be confidential.  The Court decided to do a document-by-document review of seven (7) boxes of data provided to the Court by Goodyear which Goodyear claimed should remain confidential.  (**Exhibit 52**.)

114.   On January 1, 2018, NHTSA opened its formal defect investigation regarding the G159.  The notification provided:

> As the result of a court order authorizing the release of records to NHTSA, the agency obtained claim and complaint data alleging the Goodyear G159 tires installed on Class A motorhomes failed in service, causing deaths and personal injuries.  The number of these claims suggest that the failures may stem from a safety-related defect. Many of these claims were not required to be reported under 49 C.F.R. 579 and the data produced in litigation was sealed under protective orders and confidential settlement agreements, precluding claimants from submitting it to NHTSA.

(**Exhibit 53**.)

115.   On July 24, 2017, Goodyear requested that NHTSA treat the July 10, 2017 letter from counsel as "confidential" precluding its disclosure from the public.) (**Exhibit 54**.)

116.   On February 26, 2018, NHTSA declined Goodyear's request for confidentiality regarding the entirety of the July 10, 2017 letter and associated exhibits.  (**Exhibit 55**.)

117.   On April 3, 2018, NHTSA sent its information request to Goodyear demanding the production of 35 separate categories of information regarding the G159, including field performance (failure reports) design and construction information regarding the tires.  (**Exhibit 56**.)

118.   Goodyear was admonished that its failure to respond promptly and fully to NHTSA's letter could subject Goodyear to civil penalties with a maximum $105 million penalty for a related series of violations, for failing or refusing to perform as requested by NHTSA or to respond "completely, accurately, and in a timely manner to ODI (Office of Defect Investigation) information requests."  (*Id.* at p. 11.)

119.   The documents NHTSA has just demanded included (among many others):

     1.     Precise manufacturing numbers for tires to be mounted to a 25.5 diameter rim since January 1996.

     2.     An accounting of all design, composition and production changes made to the tire from January 1996 to the present specifying the reasons for each change.

     3.     Changes made to the tire in response to field performance of the tires when mounted on Class A motorhomes.

     4.     A list of all property damage claims, injury claims and lawsuits, paid and unpaid, received by Goodyear pertaining to the Subject Tire (defined as all G159s made by Goodyear since January 1996 and sold as either original or replacement equipment to RV manufacturers).and replacement tires (defined as all G670 tires manufactured by Goodyear since January 2000, sold as either original or replacement equipment to recreational vehicle manufacturers).

     5.     Copies of all Goodyear's internal reports evaluating each tire which was the subject of each property damage claim, injury

claim or lawsuit (reports prepared by the Property Damage Claims Team at Goodyear).

6.      A list of all warranty adjustments for both the subject tire and replacement tires identifying the position on the vehicle.

7.      An explanation why Goodyear's replacement of the G159 on Monaco Windsor motorhomes was not pursued as a safety recall.

8.      Goodyear's system for monitoring performance, including adjustment and property damage data.

9.      Direction given to Goodyear's in-house counsel staff related to reporting potential safety issues within counsel's office and other offices within Goodyear from January 1996 to the present.

10.     Policies in effect governing communications of potential safety concerns between Goodyear's in-house counsel and senior executives within Goodyear.

11.     A specification of Goodyear's process to analyze warranty and/or adjustment data to detect possible safety defects.

12.     Goodyear's process to analyze property damage and personal injury claims to detect possible safety defects from 1996 to the present.
13.     Goodyear's assessment of the alleged defects in the subject tire (G159) and replacement tire (G670), including the comparison of property damage claim rates of the subject and replacement tires with those of peer tires; a comparison of adjustment rates of the subject and replacement tires and Goodyear's assessment and explanation for the property damage claim rates for the subject and replacement tires. (*Id.*)

120.    NHTSA's demand included the following language:

NHTSA has received allegations stating the defects in the subject tire has caused crashes resulting in two death or injury claims in 1998; four death or injury claims in 1999; six death or injury claims in 2000; eight death or injury claims in 2001; 18 death or injury claims in 2002; and, 57 death or injury claims from 2003 through 2015.  For each year beginning January 1, 1996, provide in tabular form the number of individual claims for death or personal injury presented to Goodyear alleging that a defect in the subject tire caused, in whole or in part, the death or injury, state what actions, if any, Goodyear took in response to the injuries and deaths allegedly caused by the G159 tire, including internal deliberations.

(*Id.* at p. 10.)

121.    On April 4, 2018, Judge Hannah issued his Under Advisement Ruling regarding the Center for Auto Safety's Motion to Unseal Court Records and Vacate the Protective Order.  (**Exhibit 57**.)

122.    The Court expressed that it had the opportunity review the documents that are subject to the protective order (the boxes of documents submitted to the Court for review by Goodyear).  (*Id*.)

123.    Judge Hannah's 25-page Order included:

- The November 25, 2015 ruling (by Judge Hannah) incorporated the protective order that the United States District Court had entered in *Haeger* I.

- The Court did *not* find that any of the information that Goodyear sought to protect was *in fact* a trade secret or commercially sensitive information.

- The Protective Order permits Goodyear and its lawyers to decide unilaterally what information will be kept confidential ….  It prohibits the plaintiffs from sharing information designated "confidential" with anyone who is not working directly on this litigation.  …  It calls for the return or destruction of documents at the close of the litigation. And it continues in effect indefinitely.

- The Protective Order differs from *Haeger* I … in that it allows the plaintiffs to disclose otherwise-protected information in a submission to NHTSA.  The plaintiffs requested that modification of *Haeger* I protective order, and the Court granted the request over Goodyear's objection.

- After oral argument on Center for Auto Safety's (CAS) motion, Goodyear delivered to the Court for *in camera* review five full bankers' boxes and two half-full boxes of documents.  The seven boxes of documents contain all the documents and information produced during discovery after having been designed "confidential" by Goodyear.

- On July 10, 2017, plaintiffs' counsel made the submission to NHTSA that had been provided for as an exception to the Protective Order.

- NHTSA has since denied Goodyear's request to keep the submittal by plaintiffs' counsel confidential.

- Protective orders were entered at Goodyear's initiative in each case arising from the failure of a G159 tire in which Goodyear disclosed confidential information.

- The protective orders in the G159 cases were based on a form of order developed by Goodyear.

- When the Haegers sought discovery concerning Goodyear's disclosures in other G159 cases, Goodyear objected on the ground that the protective orders in those cases prohibited the requested discovery. The Haegers filed the Motion to require Goodyear to Seek Relief from Protective Orders in response to that objection. The motion was granted, in a ruling that authorized the plaintiffs to apply in this case for relief from the protective orders in other G159 cases, instead of requiring the plaintiffs to apply to the courts that had originally issued the orders.

- No court that has entered a protective order in a G159 case has conducted an adversary proceeding on the question of whether information disclosed by Goodyear constitutes a trade secret. No court has engaged in the critical assessment of Goodyear's claim that the information must be kept from public disclosure.

- Goodyear's witness asserts that adjustments "provide no indication whatsoever about the safety of a given tire." … This statement is seriously misleading. The adjustment data considered collectively can afford key insights into design issues with a particular tire such the G159, especially because it allows the manufacturer to correlate tire failures with particular applications such as the use of the G159 on motorhomes, or conditions such as excessive heat.

- The Center for Auto Safety moved to intervene in this case in order to "represent the public's interest" in accessing discovery documents and sealed court records. Arizona law permits intervention by a "public interest organization active in the relevant area of concern." Implicit in the order granting the motion to intervene was a finding that CAS is an appropriate organization to represent the public's interest.

- The public has an interest in access to Goodyear's confidential information as it will help the public "understand the risks to the public health and welfare" that may be posed by Goodyear's product.

- The public also has an interest in overseeing the efforts of the government in general, and NHTSA in particular, to keep the motoring public safe.

- The Court finds that the information subject to the Protective Order relates to and reveals a possible risk of serious and widespread harm, arising from failure of G159 tires when used on recreational vehicles and motor homes.

- **Mr. Kurtz's July 10, 2017 letter to NHTSA thoroughly summarizes the public safety issues created by the G159 tire and Goodyear's longstanding, ongoing effort to minimize that issue in its dealings with government regulators and in lawsuits arising from the tire's**

**failure.  The Court adopts the contents of that letter as its findings relating to "possible" public safety risks.**  (Emphasis supplied.)

- Goodyear's contention that there is no safety risk, illustrates the public's interest.  Goodyear emphasizes that the allegations of the plaintiffs "were never tested at trial," and no lawsuit has resulted in a public safety risk finding.  The reason, of course, is that Goodyear has settled every G159 case confidentially.  Thus, Goodyear has avoided exposure to a finding of public safety risk and spun the outcome as "there is no risk."

- It is the "possible risk" of harm that the Court must balance against the competing interests outlined in Rule 26.  From that point of view, the number of G159 failures, their apparent frequency compared with the rates of similar produces, the potentially deadly consequences of failure, and the fact that the information has never been analyzed by an outside agency, all weigh in favor of disclosure.

- In *Haeger* I, Judge Silver found that Goodyear and its attorneys "made repeated, deliberate decisions . . . to delay the production of relevant information, make misleading and false in-court statements, and conceal relevant documents," for purpose of avoiding liability to the Haegers based on the failure of the G159.  The Ninth Circuit upheld those findings, including that Goodyear "participated directly in the discovery fraud."

- Judge Silver's bad faith findings became the starting point for the fraud allegations in this case.

- Goodyear was able to get away with this kind of conduct because its protective orders prevented plaintiffs from communicating or sharing information among themselves.

- Protective orders are meant to allow litigants to maintain confidentiality of trade secrets.  Goodyear appears to have been abusing that privilege in the G159 cases.  Goodyear arguably used protective orders dishonestly to gain an unwarranted advantage in litigation and to avoid tort liability.

- Even in this case, Goodyear tried to use the Protective Order improperly for litigation advantage.  Goodyear took the position that the protective order prohibited the Haegers' attorney and Spartan's attorney from talking to each about protected information to which both had access.

- Goodyear's position bordered on frivolous.  That kind of conduct, like the conduct that resulted in the discovery sanctions in *Haeger* I weighs in favor of dissolution of the Protective Order.

- Goodyear's legitimate need for confidentiality of adjustment data is reduced substantially, if not entirely eliminated by the circumstances

surrounding the tire.  When data could be interpreted to suggest that a product is dangerous, non-disclosure becomes damage control and the interest being protected is not competitive advantage but rather avoiding bad publicity and potential liability.  The observation applies especially to the lists of personal injury and property damage claims and reports concerning those claims.  Goodyear characterizes that information as "customer use data," or "warranty data" or "market place performance data."  The plaintiffs would describe it as evidence of the number of people killed or injured by a defective tire.

- Goodyear's need for confidentiality is diminished by NHTSA's decision to deny Goodyear's request for confidential treatment. Kurtz's submission to NHTSA includes much of the information Goodyear is claiming confidential.  As to that information and those documents, the proverbial cat is out of the bag.

- Goodyear's need to maintain confidentiality does not come close to outweighing the public's need for access.  The failure data should be made public because it relates to and reveals a substantial public risk to public health or safety.  By comparing the information that was disclosed in different cases, the public will be able to judge for itself whether the misuse of protective orders enabled the misconduct described by Judge Silver.

- The information will also help the public to understand how and why this happened at Goodyear and what measures should be taken to ensure that it does not happen again.

- The confidentiality provisions in the *Haeger* I settlement agreement does not create a "compelling interest" that overcomes the strong presumption in favor of public access.

- The Haegers' motion to enforce the settlement agreement with Goodyear in *Haeger* II was likewise directed to the merits of the agreement.

- The confidentiality provision in the *Haeger* II agreement between the Haegers and Goodyear does not create a "compelling interest" that overcomes the strong presumption in favor of public access with respect to the redacted version of the agreement.

- Judge Silver's finding of the waiver of attorney-client privilege applies to all of the items produced in discovery in *Haeger* II and in the *Haeger* I sanctions proceedings.  That includes materials that originated in other G159 cases.  (*Id.*)

124.  On April 4, 2018, the Maricopa County Superior Court Clerk's Office released certain materials, previously designated by Goodyear as confidential, to the Press.

125.   On April 4, 2018, at Goodyear's request, an emergency hearing was held in front of Judge Hannah regarding the dissemination of sealed materials to the Press via the Maricopa County Superior Court's Clerk's Office.  Goodyear requested the Court call the reporter and explain that the materials were disclosed in error and should not be made public.

126.   The Court ruled that though the Clerk's Office mistakenly released the materials, including the Haegers' counsel's 29-page letter to NHTSA of July 10, 2017, with approximately 200 pages of supporting materials.  The Court found that the reporter was not bound by the protective order and that there was no information that the reporter was either untruthful or did anything wrong in acquiring the letter and supporting exhibits from the Clerk's office.  The Court based its legal reasoning upon *State ex. Rel. Thomas v. Grant*, 222 Ariz. 197, 213 P.3d 346 (2009).  The Court declined Goodyear's request that the Court contact the reporter.  (**Exhibit 58**.)

127.   On April 4, 2017, at 11:20 p.m., Jalopnik issued its article, "GOODYEAR KNEW OF DANGEROUS RV TIRE FAILURES FOR OVER 20 YEARS: COURT DOCS."   The article published the entirety of the July 10, 2017 correspondence from Haegers' counsel to NHTSA.

**THE NEWLY DISCOVERED FAILURE DATA:**

128.   Before Goodyear filed its first response to the Haegers' discovery requests in October 2006, local counsel appears to have been well informed regarding the history of performance of the G159 on motorhomes.  (**Exhibit 59**, RA001488 (email outlining history of G159s on motorhomes), RA001409 (email describing lawsuits, bodily injury claims and property damage claims that are likely to be disclosed in discovery).

129.   Goodyear's local counsel was aware of all injuries current as of October 2006, before the very first discovery hearing with the Court.  (**Exhibit 60**.)

130.   Following the Court's January 2007 Order requiring Goodyear to identify all property damage claims and warranty claims involving tread separations, Goodyear disclosed 453 crown separations, 14 property damage claims and three bodily injury claims.  (**Exhibit 61**.)

131.   Following the court ordered production of property damage claims and warranty claims involving tread separations, Goodyear's counsel determined that no additional property damage claims were to be disclosed and set forth and discussed the strategy regarding the potential perception of such decision.  (**Exhibit 62**.)

132.   During *Haeger* I, Goodyear's 30(b)(6) witness testified that the G159 was "running quite successfully"; that Goodyear utilized failure data to assess the performance of the tire; that there were no field performance problems; and, that there was nothing between 1996 and 2007 that led Goodyear to believe there were any problems with the G159.  (**Exhibit 63**, Richard Olsen 30(b)(6) Deposition, p. 42, 67, 223, 434-435.)

133.   In October 2008 National Coordinating Counsel and local counsel exchanged the *Woods* exhibit list which identified documents compelled to be disclosed in August 2007, including the 6,000 pages of property damage records.  (**Exhibit 64**.)  There was no supplemental disclosure nor effort to advise the Court that Goodyear's counsel had misled the Court when he represented that Goodyear had disclosed all the data that would suggest Goodyear knew or should have known if there was a problem with the G159.

134.   Following the close of formal discovery in November 2007, Haegers' counsel continued to urge Goodyear to disclose the court ordered production of property damage and warranty records.  (**Exhibit 65**.)

135.     On October 24, 2011 (during the sanction proceedings), Goodyear's Manager of Product Analysis, James Stroble, filed a declaration with the Court.  The declaration states:

> As part of discovery in this case, Goodyear produced adjustment and property damage claims information for tires manufactured to the same specification as the tire at issue in the *Haeger* case.  This data, when compared to the number of tires then produced, reflected an adjustment rate of only a fraction of one percent (GY-HAEGER001128), and a small number of property damage claims (GY-HAEGER001125).

(**Exhibit 66**.)

136.     The declaration that there was no performance issue associated with the G159 was filed in support of Goodyear's contention that the concealed test data was irrelevant.  (*Id.*)

137.     There were no supplemental disclosures regarding failure data provided by Goodyear during the course of *Haeger* I.

138.     After initially being compelled to disclose all failure data regarding the G159, on July 5, 2016, Goodyear disclosed an updated list of property damage and injury claims, including lawsuits with DOT (Department of Transportation) numbers for each tire in *Haeger* II.  (**Exhibit 67**.)

139.     The document also "highlighted" injury and death claims settled before and during the course of litigation.  (*Id.*)

140.     On September 29, 2016, Goodyear finally disclosed what purports to be all property damage claim data, specifying (for the first time) the vehicle type and identifying the cause of failure of each tire (Condition Codes which describe various types of tread separations).  (**Exhibit 68**)

141.     On October 30, 2016, Goodyear disclosed the property damage claim records produced in the matter of *Woods v. Goodyear*, which were first produced in August 2007, pursuant to an Alabama Court Order compelling their disclosure.

1    (GY-HAEGER012674-018920 (approximately 6,000 pages of documents available
2    but not included).)

3    142.   Instead of the 14 property damage claims disclosed in *Haeger* I,
4    Goodyear's 2016 claim summary disclosed 718 property damage, injury or death
5    claims.  (**Exhibit 69**.)

6    143.   The highlighted claims in GY-HAEGER011267-11281 reveal 98
7    injury or death claims arising out of G159 failures.  (**Exhibit 70**, G159 Injury/ Death
8    Chart.)

9    144.   During the first discovery hearing in January 2007, regarding
10   compelled disclosure of property damage claims, Goodyear had represented to the
11   Court:

12   > We have produced all of the data we had as of the date of the accident
13   > so you can say, knew or should have known through negligence, or
     > that's enough data so that if there is some kind of problem in the
14   > production, it's obvious.

15   (Doc. 116, Transcript at pp. 32-33.)

16   145.   On the date of that representation, there had been 87 death or injury
17   claims involving G159 failures, which were not disclosed to the Court.  (**Exhibit 68**.)

18   146.   The Haegers' accident in 2003, was the 441st claim arising out of a
19   G159 failure that produced property damage, injury or death.  (*Id.*)

20   147.   On January 3, 2007, there had been more than 650 property damage,
21   injury or death claims involving G159 failures which were not revealed to the Court.
22   (*Id.*)

23   148.   The G159 failures involved 17 different manufactures of motorhomes
24   and 40 different models of motorhomes.  (*Id.*)

25   149.   The 6,000 pages of property damage claims involving the G159 which
26   were first disclosed in *Haeger* II in October 2016, were only a partial production of

property damage claim records.  They reveal property damage claims for 414 claimants.  Nonetheless, those records reveal that failures were occurring on all six different tire locations in all motorhomes involved.  There were failures on the left front, the right front and all rear tires.  (**Exhibit 71**, Summary of Property Damage Claims; **Exhibit 72**, Declaration of K.C. Rusboldt.)

150.    The summary reveals there were 214 G159 failures on rear tires on the motorhomes and on 240 front tires.  (*Id.*)

151.    Pursuant to Court Order compelling Goodyear to disclose adjustment data, Goodyear finally produced adjustment records for the G159 in 2016.  There were 3,484 adjustments arising out of G159 failures.  (**Exhibit 73**.)

152.    There had been 32 death or injury claims which preceded the Haegers' accident in the summer 2003.  (*See* Exhibit 70.)  By the time of the first discovery dispute hearing, the number had grown to 87.  (*See* **Exhibit 71**.)

153.    The failures identified in the 6,000 pages of property records almost universally involved motorhomes operating at highway/freeway speeds.  Hundreds of failures occurred on interstate freeways.  (*See* **Exhibit 71**.)

154.    The 6,000 pages of property damage claim records also revealed multiple different failures of the G159s occurring on different locations on an individual motorhome, often occurring over a period of days.

155.    A tire is considered to be defective if it is subject to a significant number of failures in normal operation.

156.    In August 2000, Firestone recalled approximately 14 million tires which had been utilized on Ford Explorers, to address a defect that related to motor vehicle safety.  Firestone reported the tread separation claim rates for adjustments were below .02% of the tires manufactured.  Goodyear manufactured 160,683 tires. It has revealed average adjusted crown separation (tread separation) claims for the

G159 at .28% (14 times the rate of the recalled Firestone tires).  (*See* **Exhibit 23**; **Exhibit 74**, Firestone Recall 08/16/2000.)

157.   After the Firestone recall, NHTSA investigated whether there was a defect related to motor vehicle safety in Firestone Wilderness AT tires manufactured before May 1998 that were utilized on Sport Utility vehicles.  (**Exhibit 75**.)  That investigation compared the performance of those Firestone tires (the subject tires) against the other "peer" tires utilized on sport utility vehicles.  NHTSA determined the tire suitable for comparison with the subject tire was the Goodyear Wrangler RTS.

> During this period, Ford used approximately the same number of these Goodyear tires as did Firestone (about 2.4 million tires), yet there has only been one tread separation claim involving a Goodyear tire on an Explorer compared to 486 such claims involving Firestone tires used on Explorers during the same time period.  (*Id.*)

158.   The report set forth tread separation claim frequencies for the previously recalled Firestone tires, the subject tires and the Goodyear Wrangler tires.  (**Exhibit 75**, Table 5.)  The previously recalled Firestone tires had claim failure rates of 35.5 ppm, 62.1 ppm, 93.2 ppm, 253.5 ppm and 700.5 ppm (average rate 229 ppm).  The Goodyear "peer" tires had a ppm claim rate between 0 and 10.2.  (*Id.*)

159.   In September 2000 (one year prior to the Firestone Engineering Analysis), Goodyear separately documented for Ford Motor Company the adjustments and tread separations causing property damage, death or injury claims relating to the Goodyear Wrangler RTS tires utilized on the Ford Explorers.  (**Exhibit 76**.)

160.   The following tables contrast the Goodyear Wrangler RTS tires utilized on Ford Explorers and the G159 for crown separation adjustments, tread separation property damage claims, injury and death claims and lawsuits.  (Based upon an assumption that all 160,683 G159s were utilized on motorhomes.)

**GOODYEAR WRANGLER RT/S**

| Tire Production Year | Total Tires Produced | Crown Area Warranty and Goodwill Adjustments |
|---|---|---|
| 1994 | 46,580 | 23 |
| 1995 | 1,330,612 | 409 |
| 1996 | 1,024,701 | 291 |
| 1997 | 470,915 | 124 |
| | 2,872,805 | 847 |

**GOODYEAR G159**

| Tire Production Year | Total Tires Produced | Crown Separation Adjustments |
|---|---|---|
| 1996 | 13789 | 99 |
| 1997 | 11639 | 48 |
| 1998 | 18745 | 54 |
| 1999 | 27242 | 113 |
| 2000 | 24781 | 72 |
| 2001 | 26233 | 38 |
| 2002 | 35925 | 29 |
| 2003 | 2329 | 0 |
| 2004 | 0 | 0 |
| 2005 | 0 | 0 |
| 2006 | 0 | 0 |
| Totals | 160683 | 453 |

Maximum adjustment date:  Dec. 2006

**Comparisons:**

| **Wrangler RT/S Total Production** | **G159 Total Production** |
|:---:|:---:|
| 2,872,808 | 160,683 |

**Crown Separation Adjustments (warranty returns):**

G159:  1 Crown separation adjustment per 354 tires manufactured.

Wrangler RTS: 1 Crown separation adjustment per 3,391 tires manufactured.

**Tread Separation Property Damage Claims:**

Wrangler RTS:  1 per 718,202 tires manufactured.

G159:   717 per 160,683 tires manufactured.   (If Goodyear manufactured on an equivalent basis then the property damage claims rate would equal 3,205 per 718,202 G159s manufactured)

**Injury and/or Death Claims:**

Wrangler RTS:  0 per 2,872,808 tires manufactured.

G159:  98 per 160,683 tires manufactured.

**Lawsuits:**

Wrangler RTS:  0 per 2,872,808 tires manufactured.

G159:  41 per 160,683 tires manufactured.

161.    During discovery in *Haeger* II, Goodyear witnesses admitted they could not identify a single Goodyear tire with property damage, injury or death claims that approach those revealed by the G159 on an equivalent production basis. (*See* **Exhibit 109**.)

162.    Years before *Haeger* I was settled, Associate General Counsel Deborah Okey and General Counsel, Thomas Harvie and David Bialowsky knew that there had been more than 400 property damage and injury claims involving motorhomes. (**Exhibit 77**, Settlement Authority Requests.)

163.   Internally, Goodyear defense attorneys commented about how they misled Judge Silver that there was "no universal problem" with the G159.

> Plaintiffs hope to use the Fleetwood recall and the Monaco Customer Satisfaction Claim (and especially the claims and lawsuits involving those manufacturers) as evidence that the subject tire was not suitable for motorhome applications.  We have resisted those attempts by explaining these experiences were isolated incidents unique to the vehicles involved, and did not indicate a universal problem with this tire on all motorhomes general.
>
> The Presiding Judge, Roslyn Silver, has accepted our position and has repeatedly denied plaintiffs' attempt to expand the scope of discovery….

(**Exhibit 78**.)

164.   In Judge Silver's published opinion, the Court expressed:

> Throughout the numerous discovery dispute filings and hearings, the Court was under the impression that Goodyear had produced all test data relevant to plaintiffs' claims.  In fact, at various points the Court became exasperated with plaintiffs' apparently unsubstantiated claims that additional information must exist.  Based on personal observations and discussions with (Goodyear's counsel) "during in-court hearings," this Court came to believe that [Goodyear's counsel] thoroughly understood his discovery obligations and that he was making every effort to comply with them.  There was simply no reason for the Court to question [Goodyear's counsel's] representations and plaintiffs' repeated attempts to cast dispersions on [Goodyear's counsel] appeared misguided.  Of course, now that Goodyear has been forced to admit that additional information does exist that exasperation was misplaced.

(*Haeger v. Goodyear*, 906 F. Supp. 938, 960-961 (D. Ariz. 2012).)

165.   Goodyear's National Coordinating Counsel and local counsel spent 8,182 hours advancing Goodyear's interests during *Haeger* I up to the date of its original settlement in 2010.  (**Exhibit 79**, Kurtz Declaration.)

## THE SIGNIFICANCE OF THE 2017 NHTSA DISCLOSURES:

166.   In 2006, Goodyear's answers to the Haegers' interrogatories represented Goodyear could not identify the number of G159 tires sold as original equipment on motorhomes.  (*See* **Exhibit 16**.)

167.   Goodyear's 30(b)(6) witness in *Haeger* I testified that Goodyear was unable to identify adjustment returns for tires sold for motorhome use.  (**Exhibit 80**, Richard Olsen 30(b)(6) 09/12/2007 Deposition, pp. 83-84.)

168.   In April 2006, NHTSA required Goodyear to identify failure rates due to tire blowout, tread separation, abrupt loss of air and the like for front tires manufactured and sold by Goodyear and installed on Class A motorhomes.  (See **Exhibit 2**.)

169.   The reporting requirements for medium truck tires like the G159 are different than that contained in the TREAD Act for disclosures to NHTSA regarding failures on passenger and light truck tires.  Goodyear was not required by statute to disclose the number of property damage claims for radial medium truck tires nor was it required to report adjustment/warranty returns to NHTSA as part of compliance with the TREAD Act.   NHTSA was unaware of the property damage claims mounting over the years or the 3,484 adjustments.  There was no independent way for NHTSA to assess the accuracy of Goodyear's 2006 disclosures to the regulator. It was not until July 10, 2017, that NHTSA was informed about true failure data.

170.   Goodyear represented to Judge Silver that the NHTSA peer inquiry to Goodyear in 2006 sought data on "all Goodyear steel truck tires."   The NHTSA request sought only the identification of production and failure data for that small number of Goodyear tires that fit on a 22.5-inch rim.  Goodyear's response identified a mere five tire sizes.  (Doc.  116, 01/03/2007 Transcript.)

171.   If Goodyear had disclosed to NHTSA information regarding "all steel belted truck tires" it would have been identifying data regarding hundreds of truck tires manufactured by Goodyear.  The representation to the Court that that was the nature of NHTSA's inquiry and the kind of information produced by Goodyear was false.

172.   NHTSA also required Goodyear to identify the number of G159s sold as original equipment to motorhome manufacturers for the years 2000 through 2003. (**Exhibit 81**.)  The G159 ceased production in January 2003 and was replaced by the Goodyear G670.  (*Id.*)

173.   In January 2017, NHTSA verified that the information produced by Goodyear in late December 2016 was in fact the information Goodyear had disclosed to the agency in response to its peer inquiry in 2006.  (*See* **Exhibit 46**.)

174.   Goodyear's May 30, 2006, response to NHTSA (which included 13-pages of material Goodyear deemed confidential) stated:

> The data contained on those pages marked "CONFIDENTIAL" is considered business information the disclosure of which would be detrimental to the business interests of Goodyear.  Specifically, the information contained in the responses to questions (1) and (2) includes original equipment as well as replacement tire sales figures for the subject peer tires that are not readily available to our competitors.  It also contains warranty adjustment information for these same tires.  The release of this data to the news media and/or others, who do not have and would not take to acquire benefit of the full explanation of this data, would be totally detrimental to Goodyear.  Any of the data standing alone, or in combination with other data submitted to NHTSA, could be taken out of context and used by those so inclined to discredit Goodyear's image in the minds of the consuming public.

(*See* **Exhibit 81**.)

175.   Goodyear's Manager of Government and Customer Compliance, Sim Ford, provided a verification affidavit on May 30, 2006, which stated:

> The information contained in response to the request for peer information relating to EAO5011 by Goodyear to the Office of Defects Investigation pertaining to production data, property damage claims, injury claims, and warranty adjustments has been provided where it is available from within Goodyear.

(*See* **Exhibit 81** Verification Affidavit.)

176.    The only G159 production data which Goodyear disclosed during the course of *Haeger* I was the total annual production numbers for the tire during the years of its production (1996 to 2003).  (*See* **Exhibit 23**.)

177.    Following the compelled disclosure of Goodyear's production and failure data to NHTSA, the Haegers were able to determine the actual sales by Goodyear to motorhome manufacturers of the G159 tires sold as original equipment.

178.    Goodyear manufactured 86,939 G159 tires for the years 2000, 2001 and 2002.  Goodyear revealed to NHTSA that only 25,293 of those tires were sold as original equipment on motorhomes.  (*See* **Exhibit 81**.)

179.    Until that point, the Haegers had always been led to believe that Goodyear could not identify the volume of sales to motorhome manufacturers. Consequently, until 2017, the Haegers always identified the G159 failure rates based upon the number of disclosed failures out of a universe of 160,683 tires (representing the entire number of G159s produced between 1996 and January 2003).

180.    NHTSA has now disclosed that Goodyear knew in May 2006 that only 34% of the G159s produced for the years 2000, 2001 and 2002 were actually sold for motorhome use.[8]

181.    Goodyear produced 71,415 G159s between 1996 and 1999.  (*See* **Exhibit 23**.)

182.    If 34% of those tires were sold as original equipment for motorhome use (assuming a constant percentage of sales), then 24,281 G159s were sold as original equipment for motorhomes between 1996 and the end of 1999.

183.    Assuming a constant percentage of sales as original equipment for

---

[8]  On April 3, 2018, NHTSA required Goodyear to disclose the G159 sales for 1996-1999.  That data is to be disclosed in May 2018.  Until that data is disclose, failure rates can only be precisely quantified for tires manufactured for 2000, 2001 and 2002.

1   motorhome use, 49,577 G159s would have been sold between 1996 and the end of

2   2002 out of the 158,354 tires manufactured. (*See* **Exhibit 23**,

3   GY-HAEGER001128.)

4        184.   When Goodyear disclosed, pursuant to Judge Hannah's Order, the

5   actual number of tires sold as original equipment on motorhomes, it made the failure

6   data (as a percentage of production) for the G159 skyrocket. Instead of 717 property

7   damage, injury or death claims per 160,000 tires, the calculation (again assuming a

8   constant percentage of sales for motorhome use) appears to be 717 property damage,

9   injury or death claims per 49,577 tires.

10       185.   Goodyear evaluates failure data on a parts per million basis when

11   studying the performance of its tires. (**Exhibit 82**, Richard Olsen 30(b)(6)

12   Deposition dated 09/12/2007, pp. 67-68.) The ppm failure rate for property damage,

13   injury or death claims is 4,462 ppm (assuming 160,683 tires sold and 717 property

14   damage, injury or death claims). The same ppm failure rate for the G159 equals

15   14,462 if 49,577 G159 tires were sold as original equipment on motorhomes (a 325%

16   increase).

17       186.   Goodyear witnesses were deposed in *Haeger* II before Goodyear ever

18   disclosed the original equipment sales of the G159 for motorhomes. Thus, each

19   witness was questioned about the significance of the failure data when contrasted to

20   a universe of 160,683 tires sold. No Goodyear witness could identify a ppm claim

21   failure rate for tread separations that is anything like that displayed by the G159.

22   (*See* **Exhibit 109,** cite various depositions.) The Haegers never had an opportunity

23   to question Goodyear witnesses about the true failure rate of the G159 on

24   motorhomes as Goodyear had never disclosed the number of tires sold as original

25   equipment on motorhomes pursuant to Rule 26.1 of the Arizona Rules of Civil

26   Procedure.

187.   Goodyear was compelled to disclose to NHTSA in May 2006 failure reports revealed from Goodyear's property damage claims, injury claims and warranty adjustments for the G159.  If Goodyear was dishonest in its disclosures to NHTSA, it is exposed to current fines in excess of $100 million.

188.   Goodyear disclosed 58 such failures on its G159s for the years 2000, through the end of production in January 2003.  Goodyear represented to NHTSA:

> The request in 1(b) and 2(b) seeks "failure reports" for tires installed in the front vehicle position and the data we were able to provide contains information for both front vehicle position incidents as well as incidents where the position is not known.

(*See* **Exhibit 81**, GY-HAEGER-029129.)

189.   The disclosure to NHTSA also stated: "Position and vehicle information is unavailable for adjustment (warranty) claims."  (*Id.*)

190.   As of the date of Goodyear's disclosures, there have been 39 lawsuits filed adverse to Goodyear arising out of G159 failures.  Goodyear knew which tire failed in each suit.  (*See* **Exhibit 1**.)  As of May 30, 2006, Goodyear had internally identified 157 adjustments for crown separations between 2000 and 2002.  (See **Exhibit 23**, identifying 453 crown separations between 1996 and 2006.)

191.   Goodyear's newly disclosed property damage, injury and death claims exhibit reveals that for the years 2000 through 2002, there were 201 crown separations (coded as QA/QB or CX, CV, CZ or CA).  (See **Exhibit 68**, **Exhibit 83** (Goodyear Code Conditions for Analyzing the cause of each tire failure.)

192.   Goodyear's property damage, injury and death claims list also identifies 3 tires that failed as a result of an impact break (EJ) and 10 failures as the result of the tire "running flat" (ME) between 2000 and 2002.  In total, there were 214 property damage claims arising from running flat or tread separations involving G159s during the years which were addressed by NHTSA.  (*See* **Exhibit 68**.)

193.   There were 371 tread separation type claims involving G159s which recently disclosures verify (combining adjustments with property damage claims) for the years 2000 through 2002 as opposed to the 58 disclosed to NHTSA by Goodyear.

194.   Goodyear had vastly underreported the failure reports it was compelled to disclose to NHTSA in May 2006.

**HOW GOODYEAR MISLED THE APPELLATE COURTS:**

195.   Goodyear's briefs in the Ninth Circuit and the United States Supreme Court were based upon the record Goodyear created in the District Court.  Goodyear never supplemented that record no advised either Court of known misrepresented facts or deceptions in the G159 cases of which it was aware.

196.   Though the dissenting opinion of Judge Watford in the Ninth Circuit agreed with the majority that the District Court's misconduct findings were well supported, he opined that the sanctions should be vacated.  The dissent did not believe the causal link (that honest disclosure of test data would have caused *Haeger I* to settle) was supported by the record reasoning in part as following:

> In fact, the only relevant data point in the record supports the opposite conclusion.   In the *Schalmo* case, one of the other motorhome accidents involving the same allegedly defective tire, Goodyear produced the test results at issue but the plaintiffs and Goodyear elected to take the case to trial . . .   Goodyear did not settle that case immediately upon disclosure of the test result as the District Court assumed would have happened here.

> \* \* \*

> I think the District Court clearly erred in finding that "the case more likely than not would have settled much earlier" had Goodyear disclosed the test results when it should have.

(*Haeger v. Goodyear*, 813 F.3d 1233, _____ (9th Cir. 2015).

197.   The Supreme Court, after considering Goodyear's briefs and argument also ruled:

> [T]he Haegers have not shown if this litigation would have settled as soon as Goodyear divulged the heat tests (thus justifying an all-fees award from the moment it was supposed to disclose …)  Even the District Court did not go quite that far:  In attempting to buttress this comprehensive award, it said only (and after expressing "some uncertainty") that the suit probably would have settled "much earlier." (Cite omitted.)  And that more limited finding is itself subject to grave doubt, even taking into account the deference owed to the trial court.  As Judge Watford reasoned, the test results, although favorable to the Haegers' version of events, did not deprive Goodyear of colorable defenses.  In particular, Goodyear still could have argued, as it had from the beginning, that the Haegers' own tire, which had endured more than 40,000 miles of wear and tear, failed because it struck road debris.  (Cite omitted.)  And, indeed that's pretty much the course Goodyear took in another suit alleging that the G159 caused the motorhome accident.  *See Schalmo v. Goodyear*.  (Cite omitted.)  In that case (as Judge Watford again observed), Goodyear produced the very test results at issue here, yet still elected to go to trial…. So we do not think the record allows a finding, as would support the $2.7 million award, that the disclosure of the heat tests would have led straight away to a settlement.
>
> Further, the Haegers cannot demonstrate the Goodyear's non-disclosure so permeated the suit as to make that misconduct a but-for cause of every subsequent legal expense.

*(Goodyear Tire & Rubber Company v. Haeger*, _____, (2015).)

198.   None of Goodyear's briefs on appeal revealed the concealed failure data which Goodyear was compelled to disclose in *Haeger* II.  None of the briefs revealed or corrected misrepresentations made by Goodyear to the District Court during the course of discovery.  None of the briefs corrected known fraudulent deposition testimony of Goodyear's expert.   None of the briefs corrected the misrepresentations to the Court or disclosed the obviously relevant NHTSA data.

199.   Goodyear never appropriately supplemented is discovery responses pursuant to Rule 26(e) or as compelled by the District Court scheduling order.

200.   During the course of discovery in *Haeger* II, Chris Roberts, (Schalmos' counsel) was deposed. Jim Stroble, Goodyear's 30(b)(6) expert witness in *Schalmo* (and every other G159 case other than *Haeger* I) was also deposed.  Mr. Stroble testified at the time of trial in *Schalmo*.

1        201.    Both the Ninth Circuit dissent and the Supreme Court relied upon what

2  Goodyear represented to have occurred in *Schalmo* in reaching their conclusions.

3  Neither Court was aware of deceptions which occurred in *Schalmo*.

4        202.    In *Haeger* I, Goodyear's 30(b)(6) witness admitted that the G159 was

5  prone to head-induced tread separation if exposed to prolonged operating

6  temperatures beyond 200°.  Goodyear's expert witness, Jim Gardner, in *Haeger* I

7  expressed the same opinions.  (*Haeger v. Goodyear* at 968-969.)

8        203.    None of the *Haeger* I expert witness testimony was ever disclosed to

9  the *Schalmo* court or counsel.  Thus, the only evidence the *Schalmo* court had were

10  test results that showed the tire was generating temperatures well in excess of 200°.

11  Schalmo counsel and the Schalmo court did not have access to Goodyear

12  admissions in *Haeger* I as Goodyear had declared those admissions confidential.

13  (*Id.*)

14        204.    During *Haeger* I, Goodyear's 30(b)(6) witness testified that the G159

15  failed to pass the 75 mph leg of the high speed test and as such it could not be rated

16  as a 75 mph tire.  It continued to be rated as a 65 mph tire in 1997, a year after it

17  failed to meet Goodyear's own internal test standards for suitability for freeway

18  speeds for 75 mph use.  (**Exhibit 84**, Richard Olsen 09/13/2007 Deposition, pp. 330-

19  334.)  This testimony too was never disclosed to the Schalmos nor the Schalmo court

20  as it was declared "confidential."

21        205.    The G159 underwent four (4) high speed tests in 1996.  Two occurred

22  in August and two more in December 1996.  The two tires tested in August 1996

23  failed to pass the 75 mph leg of the test.

24        206.    Prior to trial in the *Schalmo* case, Goodyear's Associate General

25  Counsel prepared a settlement memo, individually reviewed and approved by all of

26  Goodyear's senior management.  The settlement memo provided:

> The electronic data which has been located showed that the tire when tested in August 1996 satisfied Goodyear's standard for being qualified at 65 mph, but would not have satisfied Goodyear's standard for qualifying the tire at 75.

(*See* **Exhibit 77**.)

207.   Goodyear Associate General Counsel and its National Coordinating Counsel were present throughout the *Schalmo* trial.   (**Exhibit 85**, Deborah Okey 06/08/2012 Deposition, pp. 38-39.)

208.   During the course of trial, Goodyear's witness James Stroble testified directly contrary to the settlement memo authored by Okey.  He swore that the G159 passed the August 1996 test such that it was suitable to be rated 75 mph.  He testified that none of the tests indicated that the G159 was incapable of being rated at 75 mph and that the tire passed all such tests to be suitably rated as such.  (**Exhibit 86**, *Schalmo* Trial Transcript, pp. 1885-1888, 1935-1936.)

209.   Stroble had received the depositions of Olsen and Gardner which Goodyear had claimed to be confidential.  (**Exhibit 87**.)

210.   During the course of the *Haeger* I proceedings, Stroble filed a declaration supporting the claims of confidentiality regarding Goodyear 30(b)(6) expert witness in *Haeger* I (Olsen) as the result of his review of the entire deposition transcript.  (**Exhibit 88**, Stroble Declaration.)

211.   Stroble has testified that the G159 could endure temperatures near the cure temperature for rubber before it starts to degrade (in excess of 270°) in spite of his awareness of Goodyear's admission that the tire was not suitable to endure prolonged temperatures greater than 200° without tread separation.  (**Exhibit 89**.)

212.   Jim Stroble was deposed in August 2016 in *Haeger* II.  He testified that after Goodyear's expert engineer Olsen testified in *Haeger* I he never was never again requested by Goodyear to testify in any G159 case.  Stroble had no question

about Olsen's skill set and never took issue with Gardner or Olsen's opinions. (**Exhibit 90**, James Stroble 08/22/2016 Deposition, pp. 165, 166, 173.)

213.   At the time Stroble testified in *Schalmo* he was aware that the 353 pages of Olsen's deposition from *Haeger* I had been declared confidential.  (*See* **Exhibit 91**, James Stroble 08/23/2016 Deposition, pp. 207-209.)

214.   In spite of his knowledge of Goodyear's admissions he testified several times in other G159 cases differently than Olsen had testified .  He never disclosed Olsen's testimony in any of those cases.  (**Exhibit 91**, Stroble Deposition, p. 233.) He knew that the Schalmo family and court were wholly unaware of the admissions contained in those pages.

215.   Stroble directly contradicted the testimony of Goodyear's 30(b)(6) witness from *Haeger* I during the course of the *Schalmo* trial.  Stroble now claims in *Haeger* I that Goodyear's 30(b)(6) was wrong.   Stroble had previously sworn to Judge Silver, for a parade of reasons, that Olsen's testimony was a trade secret worthy of the Court's protection.  Stroble never advised Judge Silver it was "wrong." (**Exhibit 91**, Stroble Deposition, pp. 234-238.)

216.   Though Goodyear's Associate General Counsel Okey was present throughout the *Schalmo* trial, at no time did she bring Stroble's misrepresentations to the attention of the Court or Schalmo's counsel.  (**Exhibit 91**, Stroble Deposition, p. 248; *see* **Exhibit 85**.)

217.   Schalmos' counsel, Chris Roberts, was also deposed during the course of *Haeger* II.  He testified Stroble told the jury that the G159 had passed all high speed tests.  Roberts was provided a copy of long concealed deposition testimony of Olsen from *Haeger* I.  Roberts testified that Stroble directly contradicted Goodyear's expert witnesses in *Haeger* I.  Roberts testified that Stroble and Goodyear never disclosed the universe of death and injury claims (98); the property damage claims

1    (718); or the adjustments (3,484) to the *Schalmo* Court or counsel.  They never

2    disclosed the Goodyear 2006 NHTSA disclosure.  Stroble concealed the 200°

3    limitations from the Court and the jury.  (**Exhibit 92,** Christopher Roberts

4    11/14/2016 Deposition, pp. 116-125, 131-133, 137.)

5        218.   In spite of Goodyear's admissions that the G159 could not endure

6    prolonged exposure to temperatures greater than 200° during *Haeger* I, Stroble

7    testified that Goodyear's G159 has no temperature limitation.  (**Exhibit 93**, *Schalmo*

8    Trial Transcript, pp. 1765-1768.)

9        219.   Though Goodyear expert Gardner testified in *Haeger* I that the G159

10   could be prone to tread separations if prolonged exposure to 200°, he testified at trial

11   in *Schalmo* there are no temperature limitations for the G159.  (**Exhibit 93**, *Schalmo*

12   Transcript, pp. 2168-69, 2173.)

13       220.   Roberts testified that Goodyear concealed from Schalmos' counsel and

14   the Court the true property damage claim failure data.  (*See* **Exhibit 92**, Roberts

15   Deposition, pp. 130-131.)

16       221.   Roberts testified that Goodyear concealed the history of changes in

17   compounds in the G159 to make the tire more heat resistant.  (*See* **Exhibit 92**,

18   Roberts Deposition, p. 137.)

19   **GOODYEAR HAS BEEN REPEATEDLY SANCTIONED FOR DISCOVERY**

20   **MISCONDUCT:**

21       222.    Between 2006 and 2012, Goodyear was sanctioned for discovery

22   misconduct in the matter of *Ruiz v. Goodyear*, *Bahena v. Goodyear* and *Haeger v.*

23   *Goodyear.*

24       223.   On October 25, 2006, the Pima County Superior Court in the matter of

25   *Ruiz v. Goodyear,* granted the two motions for sanctions against Goodyear relating to

26   discovery.

Disclosure and discovery disputes have been the prominent and ongoing theme in this case. The goal sought by Rule 26.1 are set forth in the comments to that Rule. The Court Comment to the 1991 Amendment states in pertinent part.… It was also the intent of the rules of the trial court to deal in a strong and forthright fashion for discovery abuse and discovery abuser.

The committee, in its comment to the 1991 Amendment stated, in pertinent part:

> The committee has endeavored to set forth those items of information and evidence which should be promptly disclosed early in the course of litigation in order to avoid unnecessary and protracted discovery, as well as to incur early evaluation, assessment, impossible disposition of litigation between the parties.

> It is the intent of the committee that there be a reasonable and fair disclosure of the items set forth in Rule 26.1 and that the disclosure of that information be reasonably prompt.

One example of concern is that the objections that have been stated by Goodyear in responses to written discovery. In addition to lengthy "general objections" Defendant Goodyear has regularly interposed multi-page objections to requests for discovery.… At least one of these lengthy objections by Goodyear is on the basis that the information is "confidential, propriety and/or trade secret" notwithstanding that this Court has entered an extensive protective order in the cases requested by Defendant Goodyear.

It is clear that in some instances, Goodyear has so narrowly construed the discovery requests to disclosure rules that it has frustrated both the letter and spirit of those rules. In fact, … Goodyear has not produced documents because Goodyear has unilaterally decided that the documents are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, even when that interpretation or conclusion is not justifiable.

* * *

After more than a year of litigation the conclusion is inescapable; Goodyear has taken a position with respect to discovery and disclosure in this case which, in too many instances, is unjustifiable and which has frustrated both the letter and spirit of the discovery and disclosure rules.

* * *

Sanctions against Goodyear are appropriate and overdue.

**(Exhibit 94.)**

224.   In *Bahena* the court found:

> The Rule of Civil Procedure is speedy, just, speedy and expensive and I have found that there was nothing either just or speedy about Goodyear's response to discovery and actions in this case

* *

> I don't know who is giving them their marching orders but instead of answering interrogatories in good faith and giving real answers they shall obstruct and object.  I don't know who has created that as the mode of operandi for this case.  Maybe it's Mr. Goodyear himself if there is such a person.  Maybe it's the Board of Directors.  Maybe the Board of Directors is giving Goodyear an absolute corporate resolution that in every case where Goodyear is sued we shall obfuscate, we shall delay and we shall impede…. I find it appalling.

* * *

> The Answer remains stricken and damages will be proven up in front of a jury.

(**Exhibit 95**.)

225.   In *Haeger* I, Judge Silver issued dozens of pages of factual findings relating to discovery misconduct during the course of *Haeger* I, including throughout the sanction proceedings.  Each was based upon clear and convincing evidence.

226.   Goodyear's General Counsel, David Bialowsky was deposed in *Haeger* II.  He was Goodyear's General Counsel since 2009.  He has read Judge Silver's Opinion.  As General Counsel for the corporation he did not do anything to address Judge Silver's findings with Associate General Counsel Okey.  Bialowsky testified Judge Silver did not "get it right."   (**Exhibit 96**, David Bialowsky 12/09/2016 Deposition, pp. 6, 7, 83-84.)

227.   On December 8, 2016, prior General Counsel for Goodyear was deposed, Tom Harvie.

228.   Mr. Harvie was General Counsel for Goodyear from 1995 to 2009.  Okey supervised the G159 cases from 2000 through 2009.  Okey would keep him

1   apprised of all significant material issues.  Okey was never reprimanded or

2   disciplined for approving of conduct that resulted in sanctions in the *Bahena* case.

3   There was no change in the policy of the Legal Department about how Goodyear

4   would handle requests for information in litigation following the *Bahena* sanction

5   determination.  (**Exhibit 97**, Tom Harvie 12/08/2016 Deposition, 12/08/2016, pp. 7,

6   78-79, 84-85.)

7        229.   On October 25, 2004, Goodyear set forth its response to the Samuel's

8   Request for Production and Answers to Interrogatories.  (**Exhibit 98.**)  Goodyear's

9   response did not disclose the requested failure data.

10        230.   In August 2007, the Court entered its order regarding Woods' Motion

11   to Compel in the matter of *Woods v. Goodyear*.  The Court stated:

12        This case has been pending for three years and marked by
    disagreements over production of documents….   The Court is …
13        disgusted with the whole thing.  Goodyear is ordered to produce …
    every document regarding the G159 equipped on any and all Class A
14        motorhomes.

15   (**Exhibit 99**.)

16        231.   On August 20, 2007, Goodyear's counsel shared its comments

17   regarding the Court's Order regarding Motion to Compel in *Woods*.   As to

18   Goodyear's response to Requests for Production Nos. 14, 15 and 16 regarding

19   property damage claims, counsel acknowledged:  "We have not produced a list of

20   property damage claims but we need to do that to comply with the court order."

21        Request for Production No. 19 sought communications between Goodyear and

22   NHTSA regarding the G159.   Goodyear's counsel's notes that Goodyear had

23   responded in 2006 to NHTSA's inquiry and states:   "ODI (Office of Defect

24   Investigation) granted confidentiality.  We will object."  (**Exhibit 100**.)

25        232.   On August 30, 2007, Goodyear filed its Supplemental Response to the

26   Woods' Request for Production.  It voiced the same objection refusing to produce

1  Goodyear's response to NHTSA's 2006 inquiry even though Goodyear had a
2  protective order in place in *Woods* and disclosure was compelled by court order.
3  (**Exhibit 101**.)

4      233.   On August 1, 2007, in the matter of *Anton v. Goodyear*, counsel for the
5  plaintiffs corresponded with Goodyear.  The letter chronicles a list of discovery
6  defects, including Goodyear's continued refusal to disclose any and all property
7  damage, adjustment or lawsuit information.  (**Exhibit 102**.)

8      234.   On October 2, 2007, Goodyear filed its response to Anton's Fifth
9  Request for Production.  It voiced 16 general objections incorporated into the
10 answers.  Anton had sought identification of the G159 failures from 1999 to the
11 present.  Goodyear had limited its response to the Subject Tire, the Subject Vehicle
12 and the Subject Time Frame thereby eliminating the majority of the universe of
13 responsive failure data.  Goodyear also refused to identify Goodyear experts who
14 testified in G159 cases except any Goodyear that testified specifically in a case
15 involving the Subject Vehicle.  Goodyear also refused to disclose Goodyear
16 employees who testified in G159 cases and limited its disclosure of lawsuits to only
17 those involved the Subject Vehicle. (**Exhibit 103**.)

18     235.   The Haleys had filed a complaint against Goodyear arising out of a
19 crossover head-on collision involving a G159 tread separation in the Maricopa
20 County Superior Court in 2007.

21     236.   On June 18, 2006 the Haleys served Goodyear with their Initial
22 Disclosure Statement spanning 68-pages.  (**Exhibit 104**.)

23     237.   Goodyear provided the Haleys with Goodyear's Initial Disclosure
24 Statement.  It asserted that the Haleys identified "no defect theory."  It identified not
25 a single Goodyear witness nor a single Goodyear document regarding the G159.
26 (**Exhibit 105**.)

238.   On November 2, 2007, Goodyear responded to the Haleys' First Set of Interrogatories and their First Request for production.  Goodyear refused to identify the total failures on Class A motorhomes.  Goodyear limited its response to only property damage claims, lawsuits and bodily injury claims involving a single model of Monaco motorhomes, the Monaco Diplomat.  Goodyear refused to identify adjustment and property damage claims and again, limited its response to Monaco Diplomats.  Goodyear once again refused to disclose NHTSA communications claiming they were "confidential."  Finally, Goodyear refused to disclose documents produced in *Woods v. Goodyear* in response to the Court's order compelling disclosure alleging that production of such documents would be "burdensome, irrelevant, confidential and subject to a protective order."  (**Exhibit 106**.)

239.   On December 3, 2007, Goodyear responded to the Haleys' revised discovery requests.  Goodyear again limited its disclosure of property damage and lawsuit claims involving Class A motorhomes to only those involving the Monaco Diplomat.  Goodyear refused to identify Goodyear employee depositions from 1996 through the date of its response regarding Class A motorhome lawsuits.  Rather, Goodyear would only identify depositions in cases involving a Monaco Diplomat. (**Exhibit 107**.)

240.   On April 16, 2008, counsel for the Haleys communicated with Goodyear.  He identified ongoing discovery problems with Goodyear.  He noted Goodyear completely ignores its production obligations under Rule 26.1 A.R.C.P. He notes that Goodyear had not produced a single G159 document as of that date. He renews his demand for the production of all documents from *Woods*, which Goodyear refused to disclose.  (**Exhibit 108**.)

241.   Goodyear repeatedly chronicled its Settlement Memorandums with its understanding that the G159 failed to pass August 1996 high speed tests and as such

1    it could not be rated as a 75 mph tire.  The Settlement Memos were reviewed and

2    approved by multiple layers of Goodyear management.  The memos repetitively

3    identified Goodyear's understanding that there had been more than 400 property

4    damage and bodily injury claims involving the G159 on motorhomes.  (*See* **Exhibit**

5    **77.**)

6         242.   Goodyear witnesses Stroble, Lovell, Cavanaugh, Harvie, Bialowsky

7    and Ford all admit they have never seen a Goodyear tire with failure statistics

8    anything like the G159.  (**Exhibit 109**.)

9         243.   Goodyear Associate General Counsel identified Goodyear's role in

10   controlling disclosures in the G159 cases.  (Doc. 1047, Exhibit 40 thereto.)

11        244.   The Haleys' counsel, Tim Casey, testified regarding Goodyear's fraud

12   and deceptions.  (**Exhibit 110**.)

13   **SPARTAN SUBMITS THE FOLLOWING ADDITIONAL FACTS:**

14        245.   On June 10, 2005, Plaintiffs filed their product liability Complaint

15   arising out of the Haegers' 2003 rollover accident in their Gulfstream motorhome.

16   The accident occurred after the right front tire failed.  Various claims were made

17   against Spartan, the manufacturer or the motorhome chassis.  Plaintiff alleged, in

18   part, that Spartan knew or should have known of the defective nature of the tire

19   utilized on the chassis.  Plaintiff also claimed Spartan should have known that the

20   Goodyear tire utilized on the chassis was unsuitable for motorhome use.

21        246.   On October 23, 2006, Spartan tendered its defense to Goodyear.

22   Goodyear did not accept the tender. [Doc. 1083-1, Decl. of Shannon Raines at ¶6.]

23        247.   November 1, 2006, is the date by which Judge Silver determined

24   Goodyear's discovery fraud was obvious and permeated the remainder of the case.

25   [Doc. 1073].

26

248.   On March 31, 2009, Spartan's motion for summary judgment was granted.  [Doc. 652].

249.   Thereafter, Spartan again tendered its defense to Goodyear, and Goodyear agreed to pay only a portion of Spartan's defense costs incurred. Goodyear refused to pay the remaining defense costs of $491,456.61, incurred as of December 13, 2012. [Doc. 1083-1, Decl. of Shannon Raines at ¶21].

250.   One year later, in March, 2010, Spartan reached a settlement with Plaintiffs and was subsequently dismissed with prejudice. [Docs. 894, 898].

251.   On May 31, 2011, Plaintiffs filed a Motion for Sanctions alleging Goodyear and its attorneys committed discovery fraud by failing to disclose critical tire test data from the Court and the parties. [Doc.938].

252.   On November 23, 2011, Spartan joined Plaintiff's Motion for Sanctions, alleging that it, like Plaintiffs, has been injured by Goodyear's alleged discovery violations and failure to disclose tire testing evidence. [Doc. 966].

253.   On June 20, 2012, Spartan filed a supplemental brief related to the pending sanctions proceeding.  In the brief, Spartan provided evidence that Spartan's defense of the case through fact witness testimony from Shannon Raines (Director of Consumer Affairs) and Bryan Harris (Spartan's in-house motor home engineer) were impacted by the discovery misconduct.  The brief also referenced how Spartan's independent motor home engineering expert, Scott Craig, was unaware of the tire test data concealed by Goodyear and how his analysis and resultant liability opinions were affected by the deception. [Doc. 1048 at 2-3].

254.   On November 8, 2012, the Court entered its order in favor of Plaintiffs based upon its finding of clear and convincing evidence of Goodyear's discovery fraud.  In relation to Spartan's request for sanctions, Judge Silver denied that request, finding that "[a]bsent some evidence of a causal connection between misconduct and

Spartan's defense, Spartan is not entitled to an award of fees in this case."  [Doc. 1073].

255.    *On November 19, 2012, Spartan's counsel asked Goodyear if it would agree to an extension of time, until December 13, 2012, for Spartan to file a motion for leave to supplement the evidentiary record with evidence of the causal connection between Goodyear's misconduct and Spartan's defense.  Goodyear had no objection to Spartan's request.* [Doc. 1089-1, email from Lisa Lewallen to Jill Okun].

256.    On November 26, 2012, eighteen days after the entry of the Court's order, Spartan filed a motion requesting leave to supplement the record with evidence of the causal connection between Goodyear's misconduct and Spartan's defense. [Doc. 1074].

257.    On December 5, 2012, This Court granted Spartan's request for an extension of time to provide factual evidence cited in Spartan's motion.  Spartan was given until December 13, 2012 to provide the Court with "specific evidence of the causal connection between the misconduct at issue and Spartan's defense of this case."  [Order, Doc. 1077].

258.    On December 7, 2012, Goodyear filed a Notice of Appeal, appealing the November 8, 2012 order to the Ninth Circuit Court of Appeals. [Doc.1080].

259.    On December 13, 2012, Spartan filed its "Supplemental Pleading Regarding Causal Connection between Misconduct at Issue and Spartan's Defense of Case," providing this Court with additional sworn evidence regarding the causal relationship between the discovery misconduct and Spartan's defense of Plaintiffs' claims.  That evidence included sworn declarations from Shannon Raines, Spartan's Director of Consumer Affairs, and Lisa Lewallen, Spartan's defense counsel. [Doc. 1083].

260.    On December 21, 2012, Goodyear filed a "Request for Clarification"

1  wherein it acknowledged its previous agreement that Spartan may supplement the

2  evidentiary record and seeking confirmation that Spartan's request to supplement be

3  treated as a motion for reconsideration and no response from Goodyear was

4  permitted unless requested by the Court pursuant to Local Rule 7.2(g). [Doc. 1088].

5       261.   On June 26, 2013, Judge Silver entered an order confirming Spartan's

6  December 13, 2012 supplementation of the evidence "is a motion for reconsideration

7  regarding the portion of the sanctions order addressed to Spartan's request for

8  sanctions against Goodyear.  *Because the sanctions order regarding Goodyear is*

9  *currently on appeal, the Court will not address Spartan's additional evidence at this*

10 *time.*" [Doc. 1121].    The pending appeal addressed that portion of the Court's

11 November 8, 2012 Order that Goodyear publish the opinion in every G159 case.

12 That appeal as noted by judge silver divested the court of any further jurisdiction to

13 resolve Spartan's motion and issue a final judgment on Spartan's claims.

14      262.   In early January, 2017, Plaintiffs finally obtained critical <u>tire failure-</u>

15 <u>related</u> evidence following motions to compel filed in *Haeger II* (Plaintiff's state

16 court settlement fraud action).  Three weeks later, *Haeger II* was confidentially

17 settled.

18      263.   If Goodyear had disclosed the tire test data, failure data, and 2006

19 NHTSA information as required in November, 2006, Plaintiffs would have

20 voluntarily dismissed Spartan from the case.  (**Exhibit 111**, Decl. of David Kurtz.)

21      DATED this 13th day of April, 2018.

22                          THE KURTZ LAW FIRM

23

24      By:_____/s/ *David L. Kurtz*_____
           David L. Kurtz
25         7420 East Pinnacle Peak Road, Suite 128
           Scottsdale, AZ   85255
26         *Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

☒ I hereby certify that on April 13, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Jill G. Okun
jill.okun@porterwright.com
PORTER WRIGHT MORRIS & ARTHUR LLP
950 Main Avenue, Suite 500
Cleveland, OH   44113-7206

George Brandon
George.brandon@squiresanders.com
Kerryn L. Holman
Kerryn.holman@squirebp.com
SQUIRE SANDERS (US) LLP
One East Washington Street, Suite 2700
Phoenix, AZ   85004

James R. Condo
jcondo@swlaw.com
Lisa M. Coulter
lcoulter@swlaw.com
SNELL & WILMER, LLP
One Arizona Center
400 East Van Buren
Phoenix, AZ   85004-2202

Lisa G. Lewallen
lisa@lewallenlaw.com
LISA G. LEWALLEN, PLLC
P. O. Box 33430
Phoenix, AZ   85067

Mark I Harrison
mharrison@omlaw.com
Jeffrey B. Molinar
jmolinar@omlaw.com
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, AZ   85012-2793

☐ I hereby certify that on April 13, 2018, I served the attached document by mail on the following, who are not registered participants of the CM/ECF System:

By    /s/ K. C. Rusboldt

Plaintiffs' Ssof

- 67 -